64 F.3d 907
 UNITED STATES of America, Plaintiff-Appellee,
v.
Allen MORSLEY, a/k/a Amni Conoa, a/k/a Baldhead, a/k/a
Raleek, a/k/a Alan Mosely, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Tuval McKOY, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Melvin ADAMS, Defendant-Appellant.
 Nos. 94-5203, 94-5204 and 94-5223.
 United States Court of Appeals,
Fourth Circuit.
 Argued July 11, 1995.
Decided Aug. 31, 1995.
 
 ARGUED: Kevin Michael Schad, Cincinnati, OH, for appellant Morsley; Farris Allen Duncan, Langston & Duncan, Goldsboro, NC, for appellant Adams; William Lee Davis, III, Lumberton, NC, for appellant McKoy. John S. Bowler, Assistant United States Attorney, Raleigh, NC, for appellee. ON BRIEF: Janice McKenzie Cole, United States Attorney, Christine B. Hamilton, Assistant United States Attorney, Raleigh, NC, for appellee.
 Before HAMILTON, MICHAEL, and DIANA GRIBBON MOTZ, Circuit Judges.
 Affirmed in part, vacated in part, and remanded by published opinion. Judge DIANA GRIBBON MOTZ wrote the opinion, in which Judge HAMILTON and Judge MICHAEL joined.
 OPINION
 DIANA GRIBBON MOTZ, Circuit Judge:
 
 
 1
 Three co-defendants appeal their respective conspiracy to possess with intent to distribute cocaine convictions and related drug and weapons convictions. Despite their many assignments of error, we find no basis for reversal of those convictions; however, because in sentencing the district court miscounted the quantity of drugs properly attributable to one of the appellants, we vacate his sentence and remand for resentencing.
 
 I.
 
 2
 In late 1990 or early 1991, appellant Allen Morsley began purchasing illegal guns from Fletcher Johnson through Johnson's intermediary, Stanley Leach. Several months before, Johnson had obtained a federal firearms license to sell guns at the retail level, but he soon became attracted to the increased profits available by selling firearms illegally, without completing the required forms and registering the firearms as mandated by law. Although Morsley attempted to obtain weapons directly from Johnson, because of Morsley's unreliability, Johnson required that all of Morsley's orders be placed with Leach. In all, Morsley purchased thirteen .380-caliber handguns and four Mac-10 semi-automatic assault weapons from Johnson. On at least one occasion, Morsley attempted to trade cocaine for weapons, but Johnson refused.
 
 
 3
 Appellants Tuval McKoy and Melvin Adams also purchased unregistered weapons from Johnson (as did Lenton Earl Jordan and Clyde Andre Hendricks, both of whom later cooperated with the government against Morsley, McKoy and Adams). Beginning in 1992, McKoy purchased from Johnson five to fifteen weapons every two to three weeks, including several assault weapons and handguns ranging from .25 to .45-caliber. In the course of his weapons dealings with McKoy, Johnson observed several young men entering and leaving McKoy's house. McKoy told Johnson that he had numerous workers who assisted him in his cocaine sales which, according to McKoy, amounted to kilograms per week. McKoy later received from Johnson in exchange for cocaine approximately fifteen guns to be delivered to New York. Adams accepted delivery of the guns he procured from Johnson, via Leach, at his home in Raleigh, North Carolina. During the course of these weapons transactions, Adams also sold cocaine to Leach. In all, Morsley, McKoy, and Adams purchased hundreds of illegal guns from Johnson, many of which they later resold for use in criminal activity in the Raleigh area.
 
 
 4
 In July of 1993, Morsley, McKoy, and Adams were indicted with six other persons in a 96-count indictment. Each was charged with at least six counts of drug trafficking, wire fraud, and firearms offenses, and each was found guilty of all charges except that Adams was acquitted of a count alleging possession of firearms with obliterated serial numbers. On appeal, appellants raise fourteen challenges to their respective convictions and sentences. Only four merit extensive discussion.
 
 II.
 
 5
 The first of these is an argument that Morsley raises based on Fed.R.Evid. 404(b). Morsley contests the admission of Teshomi Crenshaw's testimony that, on the day Morsley was arrested, she was talking with "Raleek" when the police arrived. According to Crenshaw, "Raleek" then panicked, handed Crenshaw her pocketbook, and asked her to leave. Upon leaving, Crenshaw was stopped by the police, who discovered a bag of cocaine inside her pocketbook. Because all of the conduct charged in the conspiracy indictment took place prior to the day of Morsley's arrest, Morsley argues that Rule 404(b) prohibited the trial court from admitting Crenshaw's testimony as to Morsley's involvement in uncharged drug activity subsequent to the charged conduct.
 
 
 6
 Although Rule 404(b) operates generally to exclude "[e]vidence of other crimes, wrongs, or acts" offered to demonstrate a propensity to commit the charged act, such evidence is nonetheless admissible if offered for some other purpose, i.e., to demonstrate motive, opportunity, intent, plan, identity, etc. Fed.R.Evid. 404(b). Therefore, a trial court may properly admit evidence of extrinsic acts committed before the crime charged if the evidence is "(1) relevant to an issue other than character, (2) necessary, and (3) reliable." United States v. Rawle, 845 F.2d 1244, 1247 (4th Cir.1988) (footnotes omitted). Moreover, and most importantly here, acts occurring after the charged conduct are also admissible under Rule 404(b) if these three elements are satisfied. United States v. Hines, 717 F.2d 1481, 1489 (4th Cir.1983), cert. denied, 467 U.S. 1214, 104 S.Ct. 2656, 81 L.Ed.2d 363, and cert. denied, 467 U.S. 1219, 104 S.Ct. 2668, 81 L.Ed.2d 373 (1984); United States v. Hadaway, 681 F.2d 214, 217 (4th Cir.1982); see also United States v. Miller, 959 F.2d 1535, 1539-40 (11th Cir.) (en banc ), cert. denied, --- U.S. ----, 113 S.Ct. 382, 121 L.Ed.2d 292 (1992).
 
 
 7
 As a general matter, Crenshaw's testimony is "sufficiently related to the charged offense" and, therefore, is relevant. Rawle, 845 F.2d at 1247 n. 3. Of course, with respect to Rule 404(b), simple relevance is not enough; the proffered evidence also must be necessary and "relevant to an issue other than character." Id. at 1247 (emphasis added). The government argues that Crenshaw's testimony concerning Morsley's conduct "was highly probative of [Morsley's] motive and intent in the present case." The evidence may be probative as to motive and intent, but it is hardly necessary for it is abundantly clear from Morsley's charged conduct alone, without resort to his subsequent uncharged acts, that he intentionally committed the crimes alleged in the indictment.
 
 
 8
 Alternatively, the government suggests that Crenshaw's testimony was admissible to prove identity. At the time of his arraignment, Morsley represented to the court that his name was actually Amni Conoa. Although the government produced testimony at trial that Morsley was known by several aliases, including "Raleek," Morsley's attorney steadfastly maintained before the jury that Morsley and "Raleek" were not the same person. As a result, Crenshaw's testimony that she had a conversation with a man named "Raleek" who acted nervously when the police arrived to serve an arrest warrant on an individual named Allen Morsley was indeed relevant and necessary to establish identity. It was also reliable in light of testimony from Johnson, Leach, and Hendricks, corroborating that Morsley was "Raleek." See Rawle, 845 F.2d at 1247. Accordingly, Crenshaw's testimony qualifies as Rule 404(b) evidence and the trial court acted within its discretion in admitting it.[1]
 
 III.
 
 9
 McKoy's most significant claim is that he was denied due process by three separate comments the prosecutor made to the jury during closing argument. One of these allegedly improper comments occurred during the rebuttal argument by the prosecutor, when she said:
 
 
 10
 What counsel suggests to you that these agents had nothing better to do with their time than to run around and fabricate evidence. They suggest to you that we had to go look for defendants. That's insulting--
 
 
 11
 McKoy does not specify what he finds objectionable about this statement other than to say that it expresses an "improper personal opinion" of a government witness. In fact, this statement is not an expression of personal opinion by the prosecutor; rather, it is a permissible rebuttal to a defense argument. We therefore find nothing improper in this statement.
 
 
 12
 The other two prosecutorial comments present more difficult questions. First, in closing argument, the prosecutor stated:
 
 
 13
 And as far as Tuval McKoy is concerned you really don't have to give much thought to his involvement in the conspiracy, he confessed. He confessed.
 
 
 14
 McKoy immediately objected to this characterization of the oral statement he made to government agents during plea negotiations. In response to McKoy's request, the court instructed the jury that there was no evidence of a written or signed confession in the record, but rather that the evidence indicated that McKoy had merely "related aspects of his conduct" to government agents.
 
 
 15
 During the same closing argument, the prosecutor also stated:
 
 
 16
 Now, as far as Tuval McKoy, you don't even need to consider Count 91 because he stood up and pled guilty to that.
 
 
 17
 McKoy also objected to this statement and moved for a mistrial, noting that the jury had never received evidence of his plea of guilty to Count 91 of the indictment, nor had McKoy even testified at trial. The court denied the motion for mistrial but instructed the jury as follows:
 
 
 18
 Members of the jury, I understand there's been a reference to another offense. That has no bearing on this case in any way, shape or form. And the offense to which some reference was made is not for you to consider. It has no bearing on any issue in this case, whatsoever. You should not consider it in any way, shape or form. You should completely disregard any reference to that offense.
 
 
 19
 The defendants in this case, as I will tell you, are on trial only for certain offenses alleged in the indictment, and none other. And the existence or the nonexistence of any other offense is completely irrelevant to your consideration of the issues in this case.
 
 
 20
 In addition, the court agreed to redact Count 91 from the copy of the indictment to be submitted to the jury.
 
 
 21
 We have previously set forth a test for determining whether a prosecutor's conduct " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)). First, the prosecutor's comments must, in fact, have been improper. Second, the remarks must have so prejudiced the defendant's substantial rights that the defendant was denied a fair trial. United States v. Brockington, 849 F.2d 872, 875 (4th Cir.1988).
 
 
 22
 The prosecutor's statement that McKoy had pled guilty to Count 91 when no such fact was in evidence was unquestionably improper. See United States v. Samad, 754 F.2d 1091, 1100 (4th Cir.1984). Although it is a closer question, we believe the prosecutor also acted improperly in referring to McKoy's statements to federal agents as a "confession." McKoy certainly admitted several aspects of his involvement in the conspiracy, but he did not formally "confess" his guilt.
 
 
 23
 With respect to the second prong of the Brockington test, we must inquire as to whether the improper comments substantially prejudiced McKoy's right to a fair trial. Factors to be considered under this prong of the analysis include:
 
 
 24
 "(1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused;
 
 
 25
 (2) whether the remarks were isolated or extensive;
 
 
 26
 (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and
 
 
 27
 (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters."
 
 
 28
 United States v. Mitchell, 1 F.3d 235, 241 (4th Cir.1993) (quoting United States v. Harrison, 716 F.2d 1050, 1052 (4th Cir.1983), cert. denied, 466 U.S. 972, 104 S.Ct. 2345, 80 L.Ed.2d 819 (1984)).
 
 
 29
 The prosecutor's claim that McKoy had pled guilty to a count certainly could have misled the jury, giving it the impression that by pleading guilty to one count in the indictment, McKoy was tacitly admitting his guilt to all of the charges contained in the indictment. Particularly when combined with her use of the term "confession," the conduct of the prosecutor in this case reaches the limit of tolerable trial error. Nonetheless, we conclude that, upon a careful weighing of the four factors enunciated in Harrison, the error does not require reversal. Each comment was isolated; we have combed the record and no other similar comments appear in the prosecutor's principal or rebuttal closing arguments. Because there was abundant evidence establishing McKoy's guilt, these remarks could not have so prejudiced him as to deny him a fair trial. Additionally, while the record is unclear on this point, we cannot say conclusively that the prosecutor made these remarks in a deliberate attempt to divert the jury's attention from the facts of the case. Harrison, 716 F.2d at 1052. Finally, any prejudice to McKoy was effectively negated by the court's curative instructions. See United States v. Butera, 677 F.2d 1376, 1383 (11th Cir.1982) ("[p]rosecutorial misconduct can be considered harmless error where the district court gives an immediate curative instruction, and the evidence of the defendant's guilt is overwhelming"), cert. denied, 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983).
 
 
 30
 Accordingly, on the particular facts of this case--where the prosecutor's use of the term "confession" and reference to McKoy's guilty plea were isolated incidents, where the court immediately and clearly instructed the jury that it should not consider these inappropriate arguments in reference to McKoy's guilt, and where there was a great deal of evidence establishing his guilt of the charges on which the jury convicted him--the prosecutor's improper remarks constitute harmless error.[2] See Brockington, 849 F.2d at 875; Samad, 754 F.2d at 1100. Therefore, the trial court did not abuse its discretion in refusing McKoy's request for a mistrial. See United States v. Brewer, 1 F.3d 1430, 1437 (4th Cir.1993).
 
 IV.
 
 31
 Morsley and Adams also assert two sentencing errors that require some analysis.
 
 A.
 
 32
 First, Morsley argues that the district court violated Fed.R.Crim.P. 32 by refusing to consider his objections to the presentence report (PSR).[3] At his arraignment on November 22, 1993, Morsley was informed that he would be sentenced on March 7, 1994, and that, pursuant to local rule, all objections to the PSR had to be filed in writing within 15 days of receipt of the PSR. Nonetheless, Morsley did not raise any objections to his PSR until the day of sentencing, and then only orally.
 
 
 33
 The record reflects that Morsley reviewed and discussed the PSR with his attorney and that Morsley was specifically given the opportunity to meet with the probation officer who prepared the report--an opportunity that Morsley declined. Moreover, the trial judge gave Morsley "an opportunity to comment," as required at that time by Rule 32(a)(1),[4] by filing written objections within 15 days of receipt of the report. Indeed, notwithstanding his failure to take advantage of this opportunity, Morsley himself was allowed to speak at the sentencing hearing regarding the report. Thus, the record indicates that the district court complied with all of the requirements of Rule 32 in sentencing Morsley. Whether the court would then rule on Morsley's dilatory objections was a matter left to the court's discretion under Rule 32(c)(3)(A). In refusing to consider Morsley's late objections to the PSR, the court properly exercised that discretion.
 
 
 34
 As the Supreme Court has repeatedly stated, " 'the [government] certainly accords due process when it terminates a claim for failure to comply with a reasonable procedural or evidentiary rule.' " Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985) (quoting Logan v. Zimmerman Brush Co., 455 U.S. 422, 437, 102 S.Ct. 1148, 1158, 71 L.Ed.2d 265 (1982)) (emphasis in Logan ). While the version of Rule 32 applicable at the time of Morsley's sentencing did not contain a time limit for the filing of objections to the PSR, there is no language in that version of the rule that even suggests that imposition of a reasonable time limit is prohibited by the rule.[5]
 
 
 35
 The district court's imposition of a 15-day time limit in which to file objections, pursuant to the local rule, was permissible. Morsley was not denied due process by the court's refusal to rule upon his untimely objections to the PSR. See United States v. Michalek, 819 F.Supp. 250, 260-61 (W.D.N.Y.1993) (local ten-day period for filing objections to PSR satisfies due process and failure to file timely objections amounts to valid waiver of objections), aff'd, 9 F.3d 1536 (2d Cir.1993).[6]
 
 B.
 
 36
 Adams contends that the district court miscalculated the quantity of drugs attributable to him for sentencing purposes.[7] Specifically, Adams claims that 210 grams were double-counted by the court. Of course, the district court's specific factual finding regarding the proper amount of drugs will be upheld unless the record demonstrates that it is clearly erroneous, United States v. Daughtrey, 874 F.2d 213, 217 (4th Cir.1989), but the burden of proof by a preponderance of the evidence rests with the government. United States v. Williams, 880 F.2d 804, 806 (4th Cir.1989).
 
 
 37
 At trial, Anthony Holley testified that, in March of 1993, he observed Adams cutting eight ounces of cocaine into "thousand-packs" and "five-hundred-packs," which Adams claimed would fetch a price of one thousand dollars and five hundred dollars, respectively. Holley further testified that he observed Adams selling the cocaine packs over the course of four days, and that during this period, the most money he ever saw Adams receive at one time was $7,000. Based on this testimony, the district court attributed eight ounces (226.8 grams) to Adams plus the cocaine equivalent of $7,000 (196 grams). This finding, as Adams argues, amounts to double-counting and, therefore, is clearly erroneous.
 
 
 38
 Review of Holley's testimony makes clear that he observed the sale of Adams' eight ounces of cocaine in March from start to finish, and that the $7,000 Adams received during that period of observation were the proceeds from that particular sale, not the proceeds from the sale of other drugs. In fact, a close reading of the government's questioning emphasizes this point. By counting both the cocaine and the proceeds of the sale of that cocaine toward Adams' sentence, the district court improperly augmented the total amount of cocaine attributable to Adams. See United States v. Spencer, 4 F.3d 115, 119-20 (2d Cir.1993). Accordingly, the amount of cocaine applied toward Adams' sentence must be reduced by the lesser of the two quantities assessed by the district court, i.e., 196 grams.
 
 
 39
 The total quantity of drugs linked to Adams also included eight ounces of cocaine derived from a taped conversation between Adams, Johnson, and Holley, on June 7, 1993, in which Adams said that he was trying to get rid of eight ounces (226.8 grams) of cocaine. In addition to the 226.8 grams, the trial court attributed 14 grams to Adams based on a 14-gram sale between Adams and Johnson that occurred three days after the June 7 conversation. Adams contends that this 14 grams was not an additional amount of cocaine, but simply a fraction of the total eight-ounce quantity that Adams had acquired for sale on June 7. The record supports this conclusion and, tellingly, the government does not contend otherwise. Because there is no evidence in the record to support an addition of 14 grams to the eight ounces of cocaine attributed to Adams because of the June 7 conversation, the district court clearly erred in augmenting the total quantity of drugs attributable to Adams by this 14-gram amount.
 
 
 40
 Therefore, 210 grams of cocaine should not have been attributed to Adams. Because this is a significant amount of drugs and, therefore, likely impacted heavily on the sentence Adams received pursuant to the Sentencing Guidelines, we must remand so that Adams may be resentenced without regard to these 210 grams. We express no opinion on the sentence Adams may properly receive in light of our conclusion except to note that, based on the district court's original finding of 693 grams of cocaine, a reduction of 210 grams would bring Adams below the 500-gram level--the level at which the statutory five-year mandatory minimum sentence is triggered. See 21 U.S.C. Sec. 841(b)(1)(B)(ii)(II).[8]
 
 V.
 
 41
 The other challenges raised by the appellants can be more summarily addressed.
 
 A.
 
 42
 Morsley claims that three in-court identifications of him were inadmissible, having been obtained in violation of the Fifth and Sixth Amendments. After his arrest on September 23, 1993, Morsley was taken to the police department. Detectives then summoned Johnson to the station where the detectives told Johnson that they believed they were holding "Roy Lee." Through a one-way mirror, Johnson viewed Morsley, who was accompanied only by a detective and who was not represented by counsel at the time. Johnson identified Morsley as "Raleek." The government did not attempt to introduce this out-of-court identification into evidence at trial. Instead, Johnson was asked at trial to identify Morsley from among the defendants. Johnson identified Morsley as the defendant wearing a purple or "pinkish" shirt. Because Morsley was in fact wearing a white shirt and none of the defendants was wearing a purple or pink shirt, the court sustained Morsley's objection to this identification. After testifying on voir dire that he had met with Morsley in person on at least six separate occasions, Johnson was again asked to identify Morsley. Johnson correctly identified Morsley by walking toward Morsley and immediately pointing to him. (Johnson explained that the courtroom lights had made Morsley's shirt appear purple.) Only then was Johnson permitted to identify Morsley before the jury.
 
 
 43
 Since the government did not attempt to introduce Johnson's out-of-court identification at trial, our inquiry must focus on whether the government demonstrated by "clear and convincing evidence," United States v. Wade, 388 U.S. 218, 240, 87 S.Ct. 1926, 1939, 18 L.Ed.2d 1149 (1967), that Johnson's subsequent in-court identification of Morsley was unrelated to the prior out-of-court identification and was based on Johnson's "independent recollection" of Morsley's appearance. United States v. Crews, 445 U.S. 463, 473, 100 S.Ct. 1244, 1251, 63 L.Ed.2d 537 (1980). The Supreme Court has set forth various factors to be considered in assessing the independence of the in-court identification, including:
 
 
 44
 the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification.
 
 
 45
 Wade, 388 U.S. at 241, 87 S.Ct. at 1939-40.
 
 
 46
 The trial record reveals that Johnson had extensive business dealings with Morsley, meeting face-to-face with Morsley on six separate occasions over a period of several months. Johnson's personal familiarity with Morsley is itself sufficient to establish an independent basis for Johnson's identification in this case. See United States v. Burgos, 55 F.3d 933, 941 (4th Cir.1995) ("the degree to which the witness knows the suspect is critical" to demonstrating that the " 'in-court identification[ ] w[as] based upon observations of the suspect other than the lineup identification' " (quoting Wade, 388 U.S. at 240, 87 S.Ct. at 1939)). Accordingly, Johnson's in-court identification of Morsley was not tainted by his inadmissible out-of-court identification but rather was "a distinct piece of evidence independently admissible." United States v. Slater, 692 F.2d 107, 108 (10th Cir.1982).[9]
 
 
 47
 Morsley also challenges in-court identifications of him by Leach and Hendricks. While being held in jail, both men were shown a photograph of Morsley without being told the name of the man in the photograph; both identified the man in the photograph as "Raleek." At trial, Leach and Hendricks, after admitting that at the time of the photographic display they knew that the police were looking for Morsley, again identified Morsley as "Raleek." Morsley contends that the photographic identifications were unconstitutionally suggestive and that they tainted the subsequent in-court identifications by Leach and Hendricks.
 
 
 48
 In fact, both Leach and Hendricks separately identified Morsley at trial after each had testified that he had met personally with Morsley on numerous occasions to purchase cocaine. Thus, much like the situation presented in Burgos, "because the witnesses knew [Morsley] personally, the chance of misidentification from a ... suggestive photo display is virtually non-existent." 55 F.3d at 942; see also Neil v. Biggers, 409 U.S. 188, 198, 93 S.Ct. 375, 381-82, 34 L.Ed.2d 401 (1972) ("[i]t is the likelihood of misidentification which violates a defendant's right to due process ..."). Accordingly, based on the "totality of the circumstances" surrounding these in-court identifications, United States v. Hughes, 716 F.2d 234, 241 (4th Cir.1983), there is clear and convincing evidence to support the conclusion that the in-court identifications by Leach and Hendricks bore no relationship to the pre-trial photographic display. See Wade, 388 U.S. at 240, 87 S.Ct. at 1939; Burgos, 55 F.3d at 942-43.B.
 
 
 49
 Morsley next argues that he was not allowed an attorney of his choice and so he was effectively denied his Sixth Amendment right to counsel. The record reveals that, after Morsley was uncooperative with his appointed counsel, his original attorney withdrew from the case and substitute counsel was appointed. Difficulties arose between Morsley and his substitute counsel and Morsley's new attorney moved to withdraw as well. The trial court denied the motion and presented Morsley with the option of proceeding with his substitute counsel or proceeding pro se. Morsley eventually chose to continue to be represented by his substitute counsel.
 
 
 50
 In United States v. Hanley, we enumerated three points of consideration in determining whether a district court may properly deny a request for substitute counsel: (1) whether the motion for substitute counsel was timely; (2) whether the district court's inquiry into the defendant's complaint was sufficient; and (3) whether the conflict between attorney and client was so great as to amount to a "total lack of communication," thereby preventing an adequate defense. 974 F.2d 14, 17 (4th Cir.1992). Here Morsley's request for substitute counsel did not come until the morning of his arraignment. Moreover, the district court inquired extensively into Morsley's complaints about his substitute counsel and it soon became apparent that any difficulties Morsley was experiencing were due to his own belligerence. In fact, Morsley became so disruptive at one point during this inquiry that he was ejected from the courtroom. The district court is not compelled to substitute counsel when the defendant's own behavior creates a conflict. See United States v. Swinney, 970 F.2d 494, 499 (8th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 632, 121 L.Ed.2d 563 (1992), and cert. denied, --- U.S. ----, 113 S.Ct. 1650, 123 L.Ed.2d 271 (1993). Because that was clearly the case here, and because Morsley never demonstrated a "total lack of communication," Hanley, 974 F.2d at 17, the court did not err in denying Morsley's motion for substitution.
 
 C.
 
 51
 McKoy asserts the district court erred in refusing to grant his motion to suppress incriminating statements he made to government agents during plea negotiations regarding his involvement with cocaine and illegal guns and his swapping of guns for cocaine. In exchange for these statements, the government agreed to dismiss six of the eight counts against McKoy. On July 16, 1993, McKoy signed the plea agreement, which contained the following clause:
 
 
 52
 The Defendant agrees that all of these statements can be used against the Defendant at trial if the Defendant is allowed to withdraw the guilty plea.
 
 
 53
 In so agreeing, McKoy has totally undermined all of his arguments as to the use of the statements at trial. Because McKoy does not contend that he was unaware of this provision or that he was coerced into signing the plea agreement, he has waived his right to challenge the admissibility of his statements.[10]
 
 D.
 
 54
 McKoy contends that the district court's admission of an out-of-court statement by his co-conspirator, Ellison Moore, violated the rule enunciated in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). For a Bruton violation to occur, the non-testifying co-conspirator must also be a co-defendant. Id. at 135-36, 88 S.Ct. at 1628. Moore was not McKoy's co-defendant. Thus, this argument is more accurately characterized as a general challenge under the Sixth Amendment's Confrontation Clause based on McKoy's alleged inability to cross-examine Moore. See id. at 126, 88 S.Ct. at 1622 (" 'the right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him' secured by the Sixth Amendment") (quoting Pointer v. Texas, 380 U.S. 400, 404, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965)).
 
 
 55
 Despite efforts to execute an arrest warrant, the government was initially unable to produce Moore as a witness and so was forced to seek admission of his out-of-court statement incriminating McKoy. However, after the statement was admitted, Moore appeared at trial, at which time the government made Moore available to the defense for cross-examination. McKoy and his co-defendants declined this opportunity to cross-examine Moore and, therefore, cannot now claim a violation of the Confrontation Clause. See United States v. Johnpoll, 739 F.2d 702 (2d Cir.), cert. denied, 469 U.S. 1075, 105 S.Ct. 571, 83 L.Ed.2d 511 (1984).[11]
 
 E.
 
 56
 Morsley and McKoy challenge the sufficiency of the evidence to support their respective convictions of conspiring to possess with intent to distribute cocaine. To sustain a conspiracy conviction, the government must show beyond a reasonable doubt that a defendant knew of the existence of, and voluntarily participated in, the conspiracy. United States v. Brooks, 957 F.2d 1138, 1147 (4th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 3051, 120 L.Ed.2d 917 (1992); United States v. Bell, 954 F.2d 232, 236 (4th Cir.1992), cert. denied, ---- U.S. ----, 114 S.Ct. 112, 126 L.Ed.2d 77 (1993). A conspirator need not have had actual knowledge of the co-conspirators or of the details of the conspiracy. Brooks, 957 F.2d at 1147. Similarly, a conspiracy conviction must be upheld even if the defendant played only a minor role in the conspiracy. United States v. Roberts, 881 F.2d 95, 101 (4th Cir.1989). Of course, knowledge and participation may be proven by circumstantial evidence. United States v. Dozie, 27 F.3d 95, 97 (4th Cir.1994). Additionally, we must view the evidence in the record, and all reasonable inferences drawn from it, in the light most favorable to the government. Bell, 954 F.2d at 236.
 
 
 57
 As to Morsley, the government presented abundant evidence that Johnson sold numerous unregistered weapons to him. There is no indication that Morsley ever used these guns to purchase cocaine; however, he did attempt to trade cocaine for Johnson's guns on one occasion, although Johnson refused the deal. In addition, Leach testified that he purchased cocaine from "Raleek" (i.e., Morsley) in one-ounce quantities on six or seven occasions. The government also demonstrated that Morsley sold cocaine to Hendricks on numerous occasions. Thus, evidence linked Morsley to the purchase of unregistered guns from Johnson and the sale of drugs to Leach. This evidence is clearly sufficient to support Morsley's conspiracy to distribute cocaine conviction notwithstanding the lack of evidence directly linking Morsley with co-conspirators, Adams and McKoy. See Brooks, 957 F.2d at 1147.
 
 
 58
 With regard to McKoy's involvement in the conspiracy, Johnson testified that McKoy solicited him to conduct an exchange of guns for cocaine in New York. Under the terms of the deal, Johnson supplied McKoy with approximately fifteen guns that McKoy transported to New York to sell for cocaine. McKoy then transported the drugs back to Raleigh for distribution. On at least one occasion, McKoy also tried to persuade Johnson to trade guns for cocaine. Again, there is no evidence directly linking McKoy with Morsley and Adams or demonstrating a specific agreement among the three of them to distribute cocaine. However, this is not essential to upholding a conspiracy conviction. See Brooks, 957 F.2d at 1147. There is considerable evidence that McKoy was involved in the sale of cocaine in the Raleigh area and dealt directly with the same gun distributors as Morsley and Adams did, i.e., Johnson and Leach. In addition, there is evidence that, on at least one occasion, McKoy used the guns he purchased through Johnson and Leach to obtain cocaine for later distribution and sale. Viewed in the light most favorable to the government, McKoy's purchase of weapons from Johnson and his exchange of those weapons to obtain cocaine for sale in the Raleigh area is sufficient to uphold McKoy's conviction for conspiracy to distribute cocaine. See United States v. Riley, 991 F.2d 120, 125 (4th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 392, 126 L.Ed.2d 341 (1993).
 
 F.
 
 59
 Finally, McKoy argues that the government engaged in vindictive prosecution by seeking an enhanced penalty pursuant to 21 U.S.C. Sec. 851 after McKoy repudiated his plea agreement. McKoy contends that this allegedly retaliatory conduct was designed to punish him for exercising his right to trial by jury and, therefore, constituted a due process violation. The holding in Bordenkircher v. Hayes, 434 U.S. 357, 363, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978), precludes this claim. There the Supreme Court upheld the actions of a prosecutor who threatened a defendant with further charges if he chose not to plead guilty, and later carried out that threat when the defendant invoked his right to a trial. As the Court later noted, the prosecutor in Bordenkircher "explicitly told the defendant that if he did not plead guilty and 'save the court the inconvenience and necessity of a trial' he would return to the grand jury to obtain an additional charge that would significantly increase the defendant's potential punishment." United States v. Goodwin, 457 U.S. 368, 377, 102 S.Ct. 2485, 2491, 73 L.Ed.2d 74 (1982) (quoting Bordenkircher, 434 U.S. at 358, 98 S.Ct. at 665). This practice, the Court concluded, does not offend the Due Process Clause. 434 U.S. at 365, 98 S.Ct. at 669.
 
 
 60
 McKoy was well aware of the risks associated with denouncing his plea agreement and proceeding to trial. He nonetheless chose to chance the outcome of a jury trial in the hope of obtaining a better result than what the government had offered in exchange for a guilty plea. After McKoy made this voluntary choice, the government did not reindict McKoy on more serious charges, but rather simply pursued the charges against McKoy listed in the initial indictment with the intent of obtaining a stiffer penalty than that originally bargained for in the plea agreement. This conduct was well within the bounds of Bordenkircher.
 
 VI.
 
 61
 In conclusion, we affirm the convictions of Morsley, McKoy, and Adams and the sentences imposed on Morsley and McKoy. We vacate the sentence imposed on Adams and remand his case to the district court for resentencing in accordance with this opinion.
 
 
 62
 AFFIRMED IN PART, VACATED IN PART, AND REMANDED.
 
 
 
 [1]
 In a related claim, Morsley asserts that admission of this evidence violated Fed.R.Evid. 403, which provides that otherwise admissible evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." However, the district court gave the jury an extensive limiting instruction prior to admitting Crenshaw's testimony, thereby cautioning the jury to avoid an impermissible inference regarding Morsley's propensity to commit the charged act in light of the similarities between the 404(b) evidence and the charged conduct. See United States v. Mitchell, 49 F.3d 769, 777 (D.C.Cir.1995); see also Huddleston v. United States, 485 U.S. 681, 691-92, 108 S.Ct. 1496, 1502, 99 L.Ed.2d 771 (1988). Accordingly, the court did not abuse its discretion under Rule 403. See United States v. Masters, 622 F.2d 83, 87 (4th Cir.1980)
 
 
 [2]
 Our conclusion is in no way intended to condone the prosecutor's conduct in this case. At oral argument, appellate counsel for the government attempted to apologize for these "slip-ups." However, "[t]he more serious, although perhaps less tangible, consequences of these unfortunate comments are the basic image of unfairness they project and the inevitable stain they place on our trial system." Harrison, 716 F.2d at 1051. The conduct in this case falls within the range of prosecutorial conduct that would qualify for reversal but for the mitigating factors present here
 
 
 [3]
 At the time of Morsley's sentencing, Rule 32 provided, in pertinent part:
 Prior to the sentencing hearing, the court shall provide the counsel for the defendant ... notice of the probation officer's determination ... of the sentencing classifications and sentencing guideline range believed to be applicable to the case. At the sentencing hearing, the court shall afford the counsel for the defendant ... an opportunity to comment upon the probation officer's determination and on other matters relating to the appropriate sentence. Before imposing sentence, the court shall also--
 (A) determine that the defendant and defendant's counsel have had the opportunity to read and discuss the presentence investigation report ...;
 (B) afford counsel for the defendant an opportunity to speak on behalf of the defendant; and
 (C) address the defendant personally and determine if the defendant wishes to make a statement and to present any information in mitigation of the sentence.
 Fed.R.Crim.P. 32(a)(1) (1994).
 
 
 [4]
 On February 1, 1995, Rule 32 was amended to include the following provision:
 Within 14 days after receiving the presentence report, the parties shall communicate in writing to the probation officer, and to each other, any objections to any material information ... contained in or omitted from the presentence report.
 Fed.R.Crim.P. 32(b)(6)(B) (1995). This version of the federal rule essentially incorporates the challenged local rule limiting the time in which to file objections to the presentence report. It was not in effect at the time of Morsley's sentencing hearing; however, it is worth noting that, if we were to remand Morsley's case for resentencing, as he requests, he would be subjected to the revised federal rule, which specifically contains the provision he now challenges in the local rule.
 
 
 [5]
 Our decision is consistent with United States v. Jones, 913 F.2d 174 (4th Cir.1990), cert. denied, 498 U.S. 1052, 111 S.Ct. 766, 112 L.Ed.2d 785 (1991). In Jones, both the government and the defendant filed timely objections to the PSR. However, the government argued for the first time at sentencing that the defendant's base sentencing level should be augmented by two points, an objection the government had not raised during the period prescribed by local rule in light of its mistaken belief that the defendant qualified for a "career offender" sentencing enhancement. Because this new objection did not unfairly prejudice the defendant, we excused the government's failure to comply with the local rule. Id. at 178. In sharp contrast, Morsley filed no timely objections to the PSR, choosing instead to raise all of his objections for the first time at the sentencing hearing, and without providing a legitimate excuse for the delay
 
 
 [6]
 Morsley also challenges the constitutionality of United States Sentencing Guideline Sec. 4B1.2--which allows for increased sentences for "career offenders"--asserting that the United States Sentencing Commission exceeded the authority granted to it by Congress when it authorized enhanced "career offender" sentences for defendants with prior drug conspiracy convictions or whose instant offense is a drug conspiracy conviction. We and a majority of our sister circuits have previously considered and rejected this argument. See United States v. Kennedy, 32 F.3d 876, 888-90 (4th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 939, 130 L.Ed.2d 883 (1995); see also United States v. Williams, 53 F.3d 769, 772 (6th Cir.1995); United States v. Weir, 51 F.3d 1031, 1032 (11th Cir.1995); United States v. Piper, 35 F.3d 611, 620 (1st Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1118, 130 L.Ed.2d 1082 (1995); United States v. Damerville, 27 F.3d 254 (7th Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 445, 130 L.Ed.2d 355 (1994); United States v. Hightower, 25 F.3d 182, 187 (3d Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 370, 130 L.Ed.2d 322 (1994); United States v. Allen, 24 F.3d 1180, 1185-87 (10th Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 493, 130 L.Ed.2d 404 (1994); United States v. Baker, 16 F.3d 854, 857 (8th Cir.1994); United States v. Heim, 15 F.3d 830, 832 (9th Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 55, 130 L.Ed.2d 14 (1994). But see United States v. Bellazerius, 24 F.3d 698, 702 (5th Cir.) (concluding that Sec. 4B1.2 is unconstitutional), cert. denied, --- U.S. ----, 115 S.Ct. 375, 130 L.Ed.2d 326 (1994); United States v. Price, 990 F.2d 1367, 1370 (D.C.Cir.1993) (same)
 
 
 [7]
 Adams' PSR recommended that 443.8 grams of cocaine be attributed to him; however, at sentencing, the district court attributed 693 grams of cocaine to him
 
 
 [8]
 Also with regard to sentencing, McKoy argues that he was given improper notice of the government's intention to seek an enhanced penalty under 21 U.S.C. Sec. 851. This argument is meritless. The government's notice was both timely--filed on September 15, 1993--and sufficient to apprise McKoy of the convictions on which the government intended to rely for sentence enhancement purposes. Moreover, the claim that the government failed to prove the existence of the prior conviction on which it relied to support the sentence enhancement is squarely refuted by the record
 
 
 [9]
 Morsley also argues that Johnson's in-court identification was itself unreliable based on Johnson's initial inability to identify Morsley. However, the trial judge in fact concluded that Johnson's initial in-court identification of Morsley was unreliable and ordered the jury to disregard this identification. It was only after voir dire, in which Johnson demonstrated his familiarity with Morsley and then correctly pointed to Morsley, that the trial judge permitted Johnson to identify Morsley before the jury. Based on the totality of circumstances surrounding the identification, this was not an abuse of discretion
 
 
 [10]
 McKoy also argues that the district court abused its discretion in limiting his ability to cross-examine three prosecution witnesses. This argument lacks merit in light of the broad latitude afforded a trial judge in controlling cross-examination, see Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986), and the fact that McKoy does not contend that these alleged errors in any way affected the jury's verdict
 
 
 [11]
 Additionally, McKoy claims that admission of Moore's statement violated the federal rules of evidence. First, he claims that Moore's statement to a government agent that he had purchased both firearms and cocaine from McKoy was not admissible as a statement against penal interest. See Fed.R.Evid. 804(b)(3). Such a statement "so far tended to subject [Moore] to ... criminal liability ... that a reasonable person in [Moore's] position would not have made the statement unless believing it to be true." Id. McKoy alternatively contends that Moore's hearsay statement should not have been admitted because the government failed to meet the requirements of Rule 804(a) for demonstrating unavailability. However, the record reveals that the government made a good faith effort to secure Moore's presence at the trial, including obtaining an arrest warrant and attempting to serve him with that warrant. The government exercised all "reasonable means" to produce Moore at trial. Fed.R.Evid. 804(a)(5). Accordingly, the district court properly concluded that the government had met the burden of demonstrating its declarant's unavailability. See Ohio v. Roberts, 448 U.S. 56, 74, 100 S.Ct. 2531, 2543, 65 L.Ed.2d 597 (1980)