Filed:  September 29, 1998

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

―――――――――

Nos. 95-5312(L)
(CR-94-208-WN)

―――――――――

United States of America,

Plaintiff - Appellee,

versus

Bruce C. Bereano,

Defendant - Appellant.

―――――――――

O R D E R

―――――――――

The court amends its opinion filed August 28, 1998, as follows:

On page 7, first full paragraph, lines 10-11 -- "E.D. VA." is corrected to read "E.D. Va."

On page 8, first full paragraph of continuation of footnote 5, line 4 -- the opening parenthesis before "a scheme" is deleted.

On page 9, first paragraph, lines 7-8 -- the phrase "complaints about Bereano's billing" is corrected to read "complaints about the defendant's billing."

On page 18, first paragraph, line 4 -- the phrase "told the jury that Bereano used" is corrected to read "told the jury that the defendant used."

On page 18, first paragraph, line 5 -- the phrase "inferred that Bereano had been charged" is corrected to read "inferred that the defendant had been charged."

For the Court - By Direction

_____/s/ Patricia S. Connor_____
Clerk

**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                    No. 95-5312

BRUCE C. BEREANO,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellant,

v.                                                    No. 95-5395

BRUCE C. BEREANO,
Defendant-Appellee.

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
William M. Nickerson, District Judge.
(CR-94-208-WN)

Argued: December 5, 1997

Decided: August 28, 1998

Before WILLIAMS, Circuit Judge,
WILSON, Chief United States District Judge for the
Western District of Virginia, sitting by designation, and
MORGAN, United States District Judge for the
Eastern District of Virginia, sitting by designation.

_____

Affirmed in part and vacated and remanded as to sentencing by
unpublished opinion. Judge Morgan wrote the majority opinion, in

which Judge Williams joined. Chief Judge Wilson wrote an opinion concurring in part and dissenting in part.

_____

**COUNSEL**

**ARGUED:** M. Albert Figinski, Stuart Ross Berger, WEINBERG & GREEN, L.L.C., Baltimore, Maryland, for Appellant. Dale Preston Kelberman, Assistant United States Attorney, Baltimore, Maryland, for Appellee. **ON BRIEF:** Lynne A. Battaglia, United States Attorney, Stephen S. Zimmerman, Assistant United States Attorney, Baltimore, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

MORGAN, District Judge:

On May 26, 1994, Bereano, an attorney and a registered Maryland lobbyist, was charged with eight counts of mail fraud. On November 30, 1994, the jury found Bereano guilty on seven counts of mail fraud.[1] Four of Bereano's lobbying clients were billed $150.00 each for "legislative entertainment" in their September 1, 1990 bills; those amounts were found to actually represent reimbursements for unauthorized campaign contributions. Bereano appeals, arguing first that there was insufficient evidence to support a conviction of mail fraud under 18 U.S.C. § 1341 (1994), second that the indictment insufficiently pled violations of 18 U.S.C. § 1346 (1994), third that the trial court abused its discretion in permitting the Government to offer evidence of Maryland state election laws to prove the defendant's motive and intent, fourth that the trial court erred in denying defendant's

_____

[1] Count 8 was dismissed pursuant to Bereano's motion for a judgment of acquittal.

2

motion for individualized voir dire, and finally that the trial court improperly allowed the Government to use a witness's grand jury testimony as evidence. The Government cross-appeals, arguing first that the trial court erred in refusing to enhance the defendant's sentence for "losses" incurred of more than $10,000 and second that the trial court erred in departing downward from the applicable sentencing guidelines range by two levels. For the reasons that follow, we affirm the judgment of the district court in part and vacate and remand as to sentencing.

I.

On May 26, 1994, the Grand Jury returned an eight count indictment charging Bereano with mail fraud under 18 U.S.C. §§ 1341 and 1346. The indictment was predicated on two theories, the knowing and willful scheme: (1) to defraud clients of money and property by submitting bills which included false statements of expenses incurred and (2) to defraud clients of their right to Bereano's honest and loyal services. The indictment described a three-part scheme: (1) Bereano requested employees of the law firm of Bereano & Resnick and various family members to draw checks for political contributions which were distributed to candidates through Bereano's political action committee ("PAC"); (2) the employees and family members received reimbursements through checks from Bereano's law firm often with false notations concerning the check's true purpose; and (3) the reimbursements were pro-rated among Bereano's clients' bills under the heading of "legislative entertainment." The retainer agreements between Bereano and his lobbying clients did not include authorization to make such contributions. The clients only agreed to pay Bereano a fixed retainer for his lobbying services and "reasonable and necessary expenses," such as photocopying, long distance phone calls, and "legislative entertainment," which Bereano defined as meals and entertainment, including sports events and concerts.

Prior to trial, several in limine motions were presented concerning which testimony would be admissible at trial. The use of Maryland state election laws was an issue included in the limine motions. The trial court determined that a violation of the Maryland state election laws was both unnecessary and insufficient to prove mail fraud violations, thereby precluding the defendant from proving and arguing his

3

compliance with same. However, in the course of trial, the court found that the state election laws could properly be admitted to show Bereano's intent and motive. Evidence concerning the Maryland election laws was admitted through two means. First, during its case in chief, the Government offered Exhibit 155 which was a letter written by Bereano to one of his clients explaining the Maryland election laws as he understood them, and the letter had the relevant copies of the statutes attached. The letter with attachments was admitted into evidence. During Bereano's motion for judgment of acquittal, the Government argued that the letter was relevant to show what Bereano knew of the Maryland election laws. The trial court allowed the letter and the Maryland election law statutes to be presented to the jury and instructed the jury that the laws were relevant to Bereano's motive and intent only.

Second, during closing remarks, the Government again made several references to the Maryland election laws. The prosecutor even stated that Bereano violated those laws. After the trial concluded with guilty verdicts, defense counsel again moved for a judgment of acquittal or, alternatively, for a new trial in response to these remarks. The trial court denied the motion, but stated that the amount of harm shown at trial was "de minimis."

Another issue prior to trial concerned voir dire. Bereano requested extended and individual voir dire based upon allegedly adverse publicity targeted at Bereano's lobbying practices and at lobbyists generally. The trial court rejected Bereano's request. The procedure followed at trial involved three steps. First, the trial judge asked the entire jury pool general questions concerning media exposure and potential biases. Second, those responding affirmatively to general questions directed to the whole panel were questioned individually about potential biases against lobbyists and several individuals voiced negative opinions about lobbyists. However, none of those individuals with negative opinions were chosen for jury service. Third, after completing the individual questioning of selected veniremen, the trial judge then repeated questions relative to lobbyists to the panel as a whole.

The grand jury testimony at issue was given by Sandra Steed O'Hearn, Bereano's bookkeeper and manual biller of lobbying cli-

4

ents. O'Hearn testified before the grand jury that Bereano instructed her to bill his lobbying clients for a pro-rated portion of various political contributions under the category of legislative expenses. At trial, O'Hearn denied that a policy, plan or scheme existed for falsely billing clients, and the prosecution impeached her by reading certain questions and answers from her grand jury testimony. O'Hearn testified that she did not remember such testimony before the grand jury. The grand jury transcript was never shown to O'Hearn, despite several requests by her and her attorney made prior to trial,[2] and the transcript was not entered into evidence at trial.

Other testimony at the trial included each alleged victim testifying that they perceived no fraud either in 1990 when they paid their fraudulent bills or at the time of the court proceedings.[3] However, the clients also testified that they never authorized Bereano to make political contributions nor did they agree to pay them. While O'Hearn testified that not all expenses entered into the computer were necessarily billed to clients, several of Bereano's employees testified to writing checks to Bereano's PAC for which they were later reimbursed. However, none of these employees knew whether any lobbying client was billed for the political contributions made. Finally, there was documentary evidence admitted at trial including: (1) the two check stubs for reimbursements to O'Hearn with names of Bereano's clients listed on the stubs and "#110 per BCB," which is the billing code for legislative entertainment and Bereano's initials; (2) checks to Bereano's PAC by firm employees and family members and checks reimbursing those employees for contributions made; (3) computer generated cash flow reports marking various reimbursements and legislative entertainment expenses as "billed off;" (4) bills to clients noting legislative entertainment expenses with no corresponding explanation; and (5) letters

_____

[2] The Government further asserts that defense counsel had a copy of O'Hearn's grand jury testimony. Bereano's motion in limine on this issue supports this contention in that defense counsel complains that the prosecution did not identify the pages he was reading from enabling defense counsel to "follow along and identify the accuracy of his quotation of the grand jury testimony."

[3] These same clients also testified at Bereano's sentencing hearing that they did not feel victimized.

5

written by Bereano to clients explaining his understanding of Maryland election laws and including copies of those laws.**4**

The jury found Bereano guilty of all seven counts of mail fraud. On April 21, 1995, the district court entered a judgment of conviction on all seven counts and sentenced Bereano to a five year term of probation with six months of that time to be served in community confinement, 500 hours of community service and a fine of $20,000. The sentence was imposed as to each of the seven counts of conviction, with all sentences to run concurrently. Further, a special assessment of $350 was imposed. However, the court granted Bereano a stay of the sentence pending appeal based upon its observation that this case "is a close case" with a "number of appellate issues" which warranted a stay.

II.

In reviewing the sufficiency of the evidence, the appellate court "will sustain the jury's verdict `if there is substantial evidence, taking the view most favorable to the Government, to support it.'" United States v. Jackson, 124 F.3d 607, 610 (4th Cir. 1997) (quoting Glasser v. United States, 315 U.S. 60, 80 (1942)). "Substantial evidence is evidence that a reasonable finder of fact would accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." Id.

In order to establish the crime of mail fraud, the Government must prove a scheme to defraud and the use of the mails in the execution of that scheme. See Periera v. United States, 347 U.S. 1, 8 (1954). In addition, the Government must establish that Bereano acted with the requisite intent to defraud. The scheme to defraud must be intended to deprive the victims of money or property, see McNally v. United States, 483 U.S. 350, 355 (1987), or their right to honest services. See United States v. Bryan, 58 F.3d 933, 942 (4th Cir. 1995); 18 U.S.C. § 1346 (1994). While the Government must prove an intent to defraud, it is not necessary for the Government to establish that the

_____

**4** The admission of this evidence is assigned as error by Bereano and the jury was instructed to consider it only as evidence of Bereano's motive and intent.

6

victim actually suffered a loss, only that Bereano intended such. <u>See</u> <u>United States v. Barber</u>, 668 F.2d 778, 784-85 (4th Cir.), <u>cert. denied</u>, 459 U.S. 829 (1982).

Bereano argues that this Circuit should follow the lead of the Second Circuit and hold that more than a mere intent to deceive his clients is required. Instead, Bereano argues the Government must prove an actual intent to defraud and some type of contemplated harm which Bereano asserts does not exist in this case. <u>See United States v. Starr</u>, 816 F.2d 94, 98 (2d Cir. 1987); <u>United States v. Regent Office Supply Co.</u>, 421 F.2d 1174, 1182 (2d Cir. 1970); <u>United States v. D'Amato</u>, 39 F.3d 1249, 1256-57 (2d Cir. 1994). This Circuit has not held that contemplated harm is necessary in order to establish mail fraud. <u>See United States v. Butler</u>, 704 F. Supp. 1351, 1354 (E.D. Va. 1989) (noting that the view that a finding of "contemplated harm" is required was adopted by the Second Circuit only, "and is in opposition to the rule in the majority of the Circuits. The Court does not agree that this situation represents so significant a split in the Circuits that the Fourth Circuit's eventual view is doubtful."), <u>aff'd</u>, 905 F.2d 1532 (4th Cir.), <u>cert. denied</u>, 498 U.S. 900 (1990). Other Circuits are split as to whether contemplated harm is necessary.**5** Yet, regard-

_____

**5** Some circuits have followed the Second Circuit's lead and required some contemplated harm to be present to establish intent to defraud. <u>See, e.g.</u>, <u>United States v. Cochran</u>, 109 F.3d 660, 668 (10th Cir. 1997) ("We acknowledge that where actual harm exists as a natural and probable result of a scheme, fraudulent intent may be inferred. But we agree that in the absence of actual or potential harm, evidence independent of the alleged scheme must be adduced to show fraudulent intent towards the alleged victim." (citations omitted)); <u>United States v. Jain</u>, 93 F.3d 436, 441 (8th Cir. 1996) ("`The scheme to defraud need not have been successful or complete. Therefore, the victims of the scheme need not have been injured. However, the Government must show that some actual harm or injury was <u>contemplated</u> by the schemer.'" (emphasis in original) (quoting <u>D'Amato</u>, 39 F.3d at 1257)), <u>cert. denied</u>, ___ U.S. ___, 117 S.Ct. 2452 (1997); <u>United States v. Stouffer</u>, 986 F.2d 916, 922 (5th Cir. 1993) ("The element of fraudulent intent, in turn, requires a showing that defendants contemplated or intended some harm to the property rights of their victims."); <u>United States v. St. Gelais</u>, 952 F.2d 90, 95 (5th Cir.) ("`Only a showing of intended harm will satisfy the element of fraudulent intent.'" (quoting <u>United States v. Starr</u>, 816 F.2d 94, 98 (2d

7

less of the standard adopted, the Government argues and we agree that contemplated harm is present in this case. The contemplated harm is Bereano's fraudulent transfer to his clients of his cost of doing business which cost took the form of political contributions. The result would be the same if a different element of the cost of doing business was involved. For example, if he had apportioned his office rent among his clients under the heading of legislative entertainment, the contemplated harm element, if required, would have been satisfied. Therefore the evidence was sufficient to convict Bereano of § 1341 mail fraud violations.

Bereano relies on statements of the victims that no harm has occurred in arguing that no contemplated harm is present. Such issues are not decided at the whim of the perceived victim. The perception of the victim or target of the scheme is ultimately irrelevant to whether Bereano devised a scheme, or acted with the requisite intent to defraud. See United States v. Brien, 617 F.2d 299, 311 (1st Cir.) ("If a scheme to defraud has been or is intended to be devised, it makes no difference whether the persons the schemers intended to defraud are gullible or skeptical, dull or bright. These are criminal statutes, not tort concepts. The only issue is whether there is a plan, scheme or artifice intended to defraud."), cert. denied, 446 U.S. 919 (1980); see also United States v. Maxwell, 920 F.2d 1028, 1036 (D.C.

_____

Cir. 1987))), cert. denied, 506 U.S. 965 (1992); United States v. Utz, 886 F.2d 1148, 1150 (9th Cir. 1989) (requiring "an intent to obtain money or property from the victim of the deceit." (citations and internal quotation marks omitted)), cert. denied, 497 U.S. 1005 (1990).

Other Circuits have held that no contemplated harm must be shown. See United States v. Frost, 125 F.3d 346, 354 (6th Cir. 1997) ("A defendant does not commit mail fraud unless he possesses the specific intent to deceive or defraud . . .; a scheme to defraud must involve [i]ntentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed." (citations and internal quotation marks omitted)). Still others have merely defined the intent to defraud as "an intent to mislead the victim by inducing an uninformed consent to part with money or property." United States v. Allard, 926 F.2d 1237, 1242 (1st Cir. 1991) (citations omitted).

8

Cir. 1990) (same); United States v. Bryza, 522 F.2d 414, 422 (7th Cir. 1975) (employee may be convicted of defrauding employer of "honest and faithful services" even if victim took no retributive action and was satisfied with defendant's performance. "[T]he defendant's intent must be judged by his actions, not the reaction of the mail fraud victims."), cert. denied, 426 U.S. 921 (1976). But see D'Amato, 39 F.3d at 1257 (holding that because alleged corporate victims had no complaints about defendant's billing or about the services, perceived no fraud and felt no harm, the lawyer, by disguising the nature of his services on bills sent to his clients, merely deceived the clients as opposed to defrauding them).

Further, while his clients argue that they were satisfied with Bereano's services, they also testified that they did not authorize and would not have knowingly paid for the political contributions Bereano made. In support of this testimony, the client's retainer agreements only called for payment of Bereano's lobbying services and to reimburse him for "necessary and reasonable expenses," including "legislative entertainment." "Legislative entertainment" was defined as wining and dining legislators, providing tickets to sporting events, and the like. The retainer agreements do not authorize Bereano to make political contributions, nor did the clients authorize such expenses by any other means.

Sending a false bill to a third party through the mails with the necessary criminal intent is a classic violation of the mail fraud statute. See United States v. Alexander, 748 F.2d 185 (4th Cir. 1984), cert. denied, 472 U.S. 1027 (1985); United States v. Perkal, 530 F.2d 604 (4th Cir.), cert. denied, 429 U.S. 821 (1976). Accepting the reasonable inferences in favor of the Government, the totality of the evidence presented is sufficient to support a finding that Bereano had a specific intent to defraud, including contemplating harm to his clients, thereby supporting his conviction on the seven mail fraud counts under § 1341.

III.

Federal Rule of Criminal Procedure 7(c)(1) requires that an indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." In order for the

indictment to be sufficient, the Court of Appeals must not find that "the indictment as a whole is so vague that it violates defendants' rights." United States v. American Waste Fibers Co., Inc., 809 F.2d 1044, 1046 (4th Cir. 1986). Whether an indictment properly charges an offense "is a matter of law which we may consider de novo if Bereano made a timely objection to the indictment." United States v. Darby, 37 F.3d 1059, 1062 (4th Cir. 1994), cert. denied, 514 U.S. 1097 (1995).

Bereano begins by challenging the sufficiency of the indictment. "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Hamling v. United States, 418 U.S. 87, 117 (1974); see also Darby, 37 F.3d at 1063 ("An indictment must contain the elements of the offense charged, fairly inform a defendant of the charge, and enable Bereano to plead double jeopardy as a defense in a future prosecution for the same offense. . . . Moreover, the indictment must include every essential element of an offense, or else the indictment is invalid; and mere reference to the applicable statute does not cure the defect." (citations and internal quotation marks omitted)). Further, "[t]he indictment may incorporate the words of the statute to set forth the offense, but the statutory language `must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged.'" United States v. Yefsky, 994 F.2d 885, 893 (1st Cir. 1993) (quoting Hamling, 418 U.S. at 117-18.)

First, Bereano argues that because he never held public office, "application of § 1346 to him overreached constitutional bounds." However, there is no indication that § 1346 only applies to public officials. Section 1346 of the statute reads "For the purposes of this chapter, the term `scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."

The plain language of the statute does not restrict its application to public officials. Further, § 1346 was a response by Congress to the Supreme Court's decision in McNally v. United States, 483 U.S. 350 (1987). Prior to McNally, numerous circuit courts, including this Cir-

10

cuit, held that the mail fraud statute covered not only schemes to defraud others of property, but also schemes designed to defraud others of "intangible rights," including the public's right to honest government. See McNally, 483 U.S. at 356. In addition to the right to honest Government, pre-McNally cases held that the intangible rights covered included an employer's or other principal's right to the honest, faithful and disinterested services of its employees or agents, usually involving a breach of a fiduciary duty. Specific examples include cases where courts found a violation of the "honest and faithful services" right where an employee took kickbacks from third parties, embezzled company funds, owned a hidden interest in a firm with which his company did business, or traded in the securities market with inside information. See, e.g., United States v. Dial, 757 F.2d 163, 168-69 (7th Cir.), cert. denied, 474 U.S. 838 (1985); United States v. Lemire, 720 F.2d 1327, 1335-36 (D.C. Cir. 1983), cert. denied, 467 U.S. 1226 (1984); United States v. Seigel, 717 F.2d 9, 14 (2d Cir. 1983); United States v. Bohunus, 628 F.2d 1167, 1174-75 (9th Cir.), cert. denied, 447 U.S. 928 (1980); United States v. McCracken, 581 F.2d 719, 721-22 (8th Cir. 1978).

McNally attempted to limit the definition of "honest and faithful services," but this Circuit has held that Congress meant to return the definition to its pre-McNally scope through enacting § 1346. See Bryan, 58 F.3d at 942; United States v. ReBrook, 58 F.3d 961, 966-67 (4th Cir.), cert. denied, ___ U.S. ___, 116 S.Ct. 431 (1995). Thus, the "honest and faithful services" concept embodied in the statute covers not only circumstances where an agent defrauds his principal by stealing money from the principal, but also where an agent defrauds his principal of his "honest and faithful services" when he breaches his fiduciary duty and conceals material information from his principal, coupled with the necessary intent and use of the mails and wires. See, e.g., United States v. Wallach, 935 F.2d 445, 463 (2d Cir. 1991), cert. denied, 508 U.S. 939 (1993); United States v. Ballard, 663 F.2d 534, 541 (5th Cir. 1981); United States v. Von Barta, 635 F.2d 999, 1006 (2d Cir. 1980), cert. denied, 450 U.S. 998 (1981); United States v. Bush, 522 F.2d 641, 648 (7th Cir. 1975), cert. denied, 424 U.S. 977 (1976); United States v. ReBrook, 837 F. Supp. 162, 167-168 (S.D.W. Va. 1993), aff'd in part and rev. in part, 58 F.3d 961 (4th Cir.), cert. denied, 116 S.Ct. 431 (1995). Therefore, § 1346 is not limited to public officials.

11

Second, Bereano focuses on the requirement that the breach must be material and that there must be an intent to defraud. See, e.g., Cochran, 109 F.3d at 667 ("[I]t would give us great pause if a right to honest services is violated by every breach of contract or every misstatement made in the course of dealing. . . . [Therefore,] § 1346 must be read against a backdrop of the mail and wire statutes, thereby requiring fraudulent intent and a showing of materiality." (citations omitted)); McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc., 904 F.2d 786, 791 (1st Cir. 1990) ("However, not every use of the mails or wires in furtherance of an unlawful scheme to deprive another of property constitutes mail or wire fraud. . . . Nor does a breach of contract in itself constitute a scheme to defraud. . . . Rather, the scheme must be intended to deceive another, by means of false or fraudulent pretenses, representations, promises or other deceptive conduct." (citations omitted)), cert. denied, 498 U.S. 992 (1990); Mandel, 591 F.2d at 1363 ("Thus, the breach of fiduciary duty must be linked with some actionable fraud in order for the proscriptions of the mail fraud statute to apply."); United States v. Venneri , 736 F.2d 995, 997 (4th Cir. 1984) ("`Any breach of fiduciary duty by a corporate employee effected in part by the use of the mails may be a violation of the federal mail fraud statute, at least when accompanied by concealment or a failure to disclose relevant material information.'" (quoting United States v. Shamy, 656 F.2d 951, 957 (4th Cir. 1981), cert. denied, 455 U.S. 939 (1982), vacated on other grounds, 886 F.2d 743 (4th Cir. 1984), cert. denied, 469 U.S. 1035 (1984))); United States v. Feldman, 711 F.2d 758, 763 (7th Cir. 1983) ("Yet not every breach of duty by an employee works as a criminal fraud, . . . and receipt of secret profits, standing alone, cannot support a mail fraud conviction . . . . Such activities must be accompanied by a scheme formed with the intent to defraud. . . . When an employee breaches a fiduciary duty to disclose information to his employer, that breach of duty can support a mail or wire fraud conviction only if the non-disclosed information was material to the conduct of the employer's business and the nondisclosure could or does result in harm to the employer." (citations omitted)); United States v. Hess, 591 F.2d 1347, 1363 (4th Cir. 1979) ("Thus, the breach of fiduciary duty must be linked with some actionable fraud in order for the proscription of the mail fraud statute to apply."). Such an argument is a challenge to the sufficiency of the evidence.

12

Reviewing the evidence in the light most favorable to the Government, there is a reasonable basis for finding that the issue of billing clients for unauthorized contributions to candidates was material. While Bereano's clients testified that they were indeed satisfied with Bereano's services, they also testified that they had not authorized contributions made to political candidates. Their understanding of the contents of "legislative entertainment" did not include these political contributions. Some clients further testified that the candidates to whom Bereano contributed were ones the clients specifically declined to support or were candidates opposed to ones the clients did support. However, it is not an element of the offense for the Government to prove that his clients would have likely contested the bills when they were first received had the clients known the true content of "legislative entertainment." The clients were billed for expenditures which they did not authorize and billed under a fraudulent category. This evidence is sufficient to uphold a finding of materiality.

To the extent that Bereano is claiming the indictment is too vague in its allegations of honest services, such issue was rejected by this Court in United States v. Bryan, 58 F.3d 933 (4th Cir. 1995). In Bryan, a public official argued that the indictment failed to allege an independent specific statute or regulation violated as part of the mail fraud scheme. See id. at 940. Alternatively, Bryan argued that in the absence of such a statute or regulation, he had no way of knowing that his conduct would be deemed criminal. See id. at 941. The Court rejected this argument, holding that there was sufficient definition to the "deprivation of the intangible right of honest services" concept developed in the courts to put Bereano on notice. See id. at 941-42. The Court noted that "[t]o the extent that this amounts to an argument that § 1346 should be declared void for vagueness, we are unpersuaded." Id. at 941. Based on our prior decisions, the statute is not too vague to put Bereano on notice of the charges he faces.

As the trial court concluded, the indictment sufficiently alleges a scheme to defraud under § 1346. The indictment alleges that Bereano was an attorney and lobbyist who was retained by various clients to represent their interests. Indictment ¶ 1, 3. As such, the indictment alleges he owed "a fiduciary duty to each of his lobbying clients to act honestly and faithfully for and on behalf of the clients." Indictment ¶ 3. The indictment alleges that Bereano defrauded those clients

13

of not only property, but his "honest and faithful services" as well. Indictment ¶ 7(b). The indictment describes Bereano's scheme to defraud in that he submitted fraudulent bills to his clients, which misrepresented payments he made to reimburse others for nominee campaign contributions they made at Bereano's behest. Indictment, ¶ 8-16. Specifically, ¶ 16 alleges that Bereano "falsely represented to his lobbying clients on their periodic bills the expenses actually incurred on their behalf, by fraudulently including in those bills the amounts of the repayment checks used to reimburse the employees and family members for political contributions, which were falsely billed to clients as, among other things, legislative entertainment." The indictment further describes how Bereano concealed this material information from his clients, such as concealing his identity as a contributor. Indictment ¶ 18. Further, in response to Bereano's argument that somehow all the allegations in paragraphs 8-16 only describe the scheme to defraud under § 1341 described in ¶ 7(a), there is no delimitation as to what ¶ 8-16 refers. Paragraphs 8-16 follow the descriptions in both ¶ 7(a) referring to § 1341 and ¶ 7(b) referring to § 1346 or § 1341. There is no heading specifically describing ¶ 8-16 as acts only supporting § 1346. When the indictment is read as a whole, therefore, it is a "plain, concise and definite statement of the facts constituting the offense" as the indictment asserts Bereano's fiduciary duty and asserts that he falsely billed his clients. Therefore, the indictment contained the elements of the offense and met the requirement to fairly inform Bereano of the charges against him.

Further, even if the indictment lacked sufficient particularity as to § 1346, or there was insufficient evidence to uphold a conviction for mail fraud based on this section, the conviction will be affirmed when another sufficient basis for the conviction exists. See Griffin v. United States, 502 U.S. 46, 52-60 (1991); United States v. McDonough, 56 F.3d 381, 390 (2d Cir. 1995) (conviction under mail fraud indictment will stand if evidence indicates statute violated in either of two ways charged). In this case, there was sufficient evidence for conviction under § 1341.

14

IV.

A.

Bereano argues that the trial court erred in admitting evidence concerning Maryland election laws.**6** The trial court's ruling on the admissibility of evidence is reviewed for an abuse of discretion. See United States v. Heater, 63 F.3d 311, 320 (4th Cir. 1995), cert. denied, ___ U.S. ___, 116 S.Ct. 796 (1996).

This Circuit has previously concluded that a prosecution for mail fraud does not require the Government to establish proof of any violation of an underlying state law or regulation. See Bryan, 58 F.3d at 940. However, evidence of state election laws may be admissible to show knowledge and intent. See United States v. Grubb, 11 F.3d 426, 433 (4th Cir. 1993) (evidence of the judicial canon of ethics was admissible and relevant to prove intent and absence of mistake, when coupled with an appropriate limiting instruction); United States v. Reamer, 589 F.2d 769, 770 (4th Cir.) (evidence of state law and Code of Professional Responsibility admissible to prove intent in trial against attorney for mail fraud), cert. denied , 440 U.S. 980 (1978); United States v. Morlang, 531 F.2d 183, 191-92 n.16 (4th Cir. 1975) (holding the standard of conduct of HUD employees in trial of HUD director admissible).

In response to objections made in this case to the prosecutor's closing arguments, the trial judge ruled the "[prosecutor] was very cir-

_____

**6** Bereano also argues that the Government implied that Bereano had committed perjury. Any implication by the Government in closing argument that Bereano had committed perjury by submitting false campaign contribution reports is reviewed for plain error as the first objection made concerning this issue was on appeal. See United States v. Mitchell, 1 F.3d 235, 242 (4th Cir. 1993); St. Gelais, 952 F.2d at 95. "To establish plain error, [a defendant] must establish that (1) the asserted defect in the trial was, in fact, error; (2) the error was plain; and (3) the error affected his substantial rights." Jackson, 124 F.3d at 614 (citing United States v. Olano, 507 U.S. 725, 732 (1993)). Any implication made was within the context of what Bereano's motive and intent were. Therefore, no plain error exists for admitting the evidence on this basis.

15

cumspect in the way he approached it and that he did not cross the line." All references to the state election laws were made within the context of Bereano sending the statutes to his clients, allegedly showing what his understanding of the law was. The statements by the prosecutor implying that Bereano was actually violating the law represented a minor portion of an extensive argument and were reported within a three-page span of the transcript of the closing argument which totaled forty pages. Finally, the trial judge, who was in the best position to weigh this issue, gave a limiting instruction that the Maryland election laws only went to prove Bereano's motive and intent. There is a presumption that a jury will follow a district court's limiting instruction. See United States v. Powers, 59 F.3d 1460, 1468 (4th Cir. 1995) (emphasizing that limiting instructions generally obviate any prejudice), cert. denied, ___ U.S. ___, 116 S.Ct. 784 (1996); United States v. Salva, 745 F.2d 840, 844 (4th Cir. 1984) (same), cert. denied, 470 U.S. 1031 (1985). The trial judge was correct in holding that the Maryland election laws were irrelevant in proving mail fraud violations. When the veil of the Maryland election laws is lifted from the evidence, it reveals a clearly visible scheme to fraudulently bill clients for unauthorized political contributions. Whether the election law evidence should have been admitted to show motive and intent presents a close question, but the evidence of mail fraud against Bereano is clear. Therefore, even if the trial court erred in admitting the election law evidence, given its instructions to the jury, any possible error was harmless. Bereano's understanding of the election laws arguably explains his motive and intent for choosing the particular scheme which he utilized. Further, Bereano asserted a defense of good faith. This evidence may be probative of bad motive or intent as opposed to good faith.

B.

In reviewing a claim of prosecutorial misconduct, the Court reviews the claim to determine whether the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." United States v. Morsley, 64 F.3d 907, 913 (4th Cir. 1995) (citations and internal quotation marks omitted), cert. denied and sub nom., McKoy v. United States, ___ U.S. ___, 116 S.Ct. 749 (1996). This Circuit has held that "`the test for reversible prosecutorial misconduct generally has two components: that (1) the prosecu-

16

tor's remarks or conduct must in fact have been improper and (2) such remarks or conduct must have prejudicially affected Bereano's substantial rights so as to deprive the defendant of a fair trial.'" United States v. Mitchell, 1 F.3d 235, 240 (4th Cir. 1993) (quoting United States v. Brockingham, 849 F.2d 872, 875 (4th Cir. 1988)) (quoted in United States v. Chorman, 910 F.2d 102, 113 (4th Cir. 1990)); Morsley, 64 F.3d at 913. This Court has noted a number of factors in evaluating the issue of prejudice to Bereano, namely "`(1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.'" Mitchell, 1 F.3d at 241 (citing United States v. Harrison, 716 F.2d 1050, 1052 (4th Cir. 1983) (quoted in Chorman, 910 F.2d at 113)), cert. denied, 466 U.S. 972 (1984); Morsley, 64 F.3d at 913.

"It is often said and often forgotten that the duty of a prosecuting attorney is not to convict defendants but to try them fairly. Absolute fairness is a counsel of perfection. But the prosecutor should hold himself to the highest practicable standard of fairness." McFarland v. United States, 150 F.2d 593, 594 (D.C. Cir. 1945). Bereano argues that prosecutorial misconduct occurred in that the prosecution first argued that the state election laws were immaterial to mail fraud, but then relied upon the same state election laws in opposing his motion for judgment of acquittal and in arguing that Bereano was guilty during closing arguments. Bereano asserts that this is prosecutorial over-reaching and that "such references were a culmination of a string of errors which permeated the trial."

Prosecutorial misconduct warrants the reversal of a conviction only in rare and egregious cases. For example, a conviction was overturned when the prosecution prejudiced the appellant's substantial rights by repeatedly referring to a conviction of another participant in the same conspiracy and the appellant's relationship to that co-conspirator. See Mitchell, 1 F.3d at 241-44. The Court based its conclusion on such factors as calling into question evidence not before the jury, the prosecution's case could withstand a sufficiency of evidence challenge but was not overwhelming, the prosecution deliberately made improper

17

comments before the jury in order to divert the jury's attention, and the district court failed to give a limiting instruction to the jury. See id. at 241-42. In contrast, no reversible error was found when the prosecution told the jury that the defendant used different names and inferred that the defendant had been charged with murder and rape previously, neither of which were true; the prosecution said in opening statements that even a condemned man gets a last meal while the victim did not; and the victim's bloodstained underclothes were kept conspicuously displayed for several hours. See McFarland, 150 F.2d at 593-94.**7**

_____

**7** More recent examples of circumstances not warranting reversal include: United States v. Burns, 104 F.3d 529, 537 (2d Cir. 1996) (holding that prosecution's applauding after defense counsel's summation was not prosecutorial misconduct because there were curative instructions given and sufficient evidence to convict without the misconduct); United States v. Collins, 78 F.3d 1021, 1039-40 (6th Cir. 1996) (holding instances of laughter, gestures and facial expressions by prosecutor may have been improper, but fell far short of reversible error), cert. denied, ___ U.S. ___, 117 S.Ct. 189 (1996); Mills v. Singletary, 63 F.3d 999, 1013-14 (11th Cir. 1995) (holding prosecutor's pretrial solicitation of comments about potential jurors from county sheriff, deputy sheriff, bailiff, clerk of court and victim's father was not prosecutorial misconduct because the conduct was not brought to the attention of anyone on venire list), cert. denied, ___ U.S. ___, 116 S.Ct. 1837 (1996); United States v. Wiley, 29 F.3d 345, 351-52 (8th Cir.) (characterization of defendant as a "criminal" and "drug dealer" did not deprive defendant of a fair trial), cert. denied, 513 U.S. 1005 (1994); United States v. Chambers, 944 F.2d 1253, 1272 (6th Cir. 1991) (holding no prosecutorial misconduct occurred when prosecution drew picture of courtroom indicating where drug defendant was sitting and nodded and winked to government witness during her testimony), cert. denied, 502 U.S. 1112 (1992); Grochulski v. Henderson, 637 F.2d 50, 53-54 (2d Cir.) (holding that although prosecutor visited homes of various alibi witnesses in order to obtain statements about their forthcoming testimony, visits were limited to minimum necessary and occurred only because defense had notified prosecution of its intent to put witnesses on stand at time later than that fixed by New York statute governing adversary notice of alibi witnesses, and therefore, there was no evidence of prosecutorial misconduct, despite claim that prosecutor intimidated witnesses), cert. denied, 450 U.S. 927 (1981); United States v. Bashaw, 509 F.2d 1204, 1205 (9th Cir. 1975) (holding prosecutor's comment during summation "that the defendant's

When evaluating the factors identified by this Circuit in answering this question, we must first determine "the degree to which the prosecutor's remarks have a tendency to mislead the jury and prejudice the accused. . . ." Mitchell, 1 F.3d at 241. First, this argument was made in the context of Bereano's knowledge of the law as it tended to prove whether he had acted in good faith which is a proper purpose as noted by the trial court. Also relevant to this inquiry is whether the trial court gave a limiting instruction concerning that evidence. Unlike Mitchell, the judge did give a limiting instruction to the jury in this case telling them that the information concerned what Bereano knew about the election laws and what his intent was. The trial judge also redacted reference to the election laws from the indictment before it was made available to the jury. Given this limiting instruction and the redaction, the comments were not prejudicial, they did not mislead the jury and they did not prejudice the accused. Therefore, this factor weighs in favor of the Government.

Second, we must determine whether the remarks were pronounced and persistent. While several allegedly inappropriate remarks were made by the prosecution, they were made within the context of what Bereano knew the law to be, which went to motive, intent, and lack of good faith. Further, the comments were few in comparison to forty pages of transcript covering the Government's closing arguments. Finally, the trial judge recognized the issue and ruled that the prosecu-

_____

evidence doesn't meet its burden of showing the defendant did not commit the crime charged" was improper, but was legally harmless, where district judge immediately instructed jury that it must not accept the statements of counsel as to the law, jury was carefully instructed that it rested upon the prosecution to prove defendant's guilt beyond a reasonable doubt, and evidence of defendant's guilt was overwhelming). But see Drake v. Kemp, 762 F.2d 1449, 1458-60 (11th Cir. 1985) (holding prosecutor's closing argument in sentencing phase of capital murder prosecution, in which prosecutor cited two state Supreme Court decisions which were over 100 years old to urge jury not to consider mercy in imposing sentence, was misleading and prejudicial; as evidence implicating defendant in murder was not overwhelming, improper argument rendered sentencing hearing fundamentally unfair), cert. denied, 478 U.S. 1020 (1986).

19

tion's statements were proper. Therefore, this factor also weighs in favor of the Government.

Third, as for the amount of properly admitted evidence available against Bereano, the trial court described the evidence as "thin" and "obscure." However, when the election law issue is put aside, the remaining evidence of fraud is clear. The alleged victims of the fraud all testified to the fact that they believe they received the full benefit of Bereano's services. However, they all testified that they did not authorize, by contract or otherwise, political contributions being charged to them. Had such victims not authorized the wining and dining of legislators, the billing of same to clients under the heading of, for example, legal research would be similarly fraudulent. Therefore, this factor also weighs somewhat in favor of the Government.

Fourth, we must assess "whether the comments were deliberately placed before the jury to divert attention to extraneous matters." Mitchell, 1 F.3d at 241. The knowing violation of Maryland state election laws arguably was evidence showing a lack of good faith by Bereano.**8**

The totality of the Mitchell factors weigh in favor of the Government, albeit some factors more than others. Accordingly the Government's argument did not "so infect the trial with unfairness as to make the resulting conviction a denial of due process." Morsley, 64 F.3d at 913 (citations and internal quotation marks omitted).

C.

An indictment may not be "`amended except by resubmission to the grand jury.'" United States v. Leichtman , 948 F.2d 370, 376 (7th Cir. 1991) (quoting Russell v. United States, 369 U.S. 749, 770 (1962)); see also Stirone v. United States, 361 U.S. 212, 215-16 (1959). If an amendment occurs, the conviction "is reversible per se." Id. However, an amendment to an indictment is not fatal in two cir-

_____

**8** The Government made that argument in its closing statement, stating: "In deciding whether Mr. Bereano acted in good faith honestly, or whether he acted with the intent to deceive, you are entitled to consider whether he believed he was violating the state's election laws. . . ."

cumstances. First, there is no amendment when the change is "merely a matter of form," such as a correction for a typographical or clerical error or a misnomer, a formal change to the date specified in the indictment within limits, or an inconsistency amounting to a simple matter of semantics. See id. Second, an indictment is not amended if "all that has happened is that the evidence or the charges submitted to the trial jury wind up being simply a more limited version of the charges in the indictment. An indictment may be narrowed, either constructively or in fact, without resubmitting it to the grand jury." Id.

Bereano claims there was an impermissible amendment of the indictment. A change to the indictment is an impermissible amendment if the change broadens the charges presented to the jury allowing them to consider more or different offenses than the grand jury charged. For example, if the indictment charges a RICO conspiracy among individuals "associated with an enterprise, to wit . . . the DeCavalcante Family of La Cosa Nostra," but the jury is only instructed that the defendants are associated with"an enterprise," then an amendment has occurred. See Leichtman, 948 F.2d at 377-78. "[T]he more general instruction would allow the defendants to be convicted of an enterprise other than the one charged in the indictment, violating [the defendant's] right to be tried only on the charges approved by the grand jury . . . ." Id. at 377.

In this case, Bereano was charged with eight counts of mail fraud. References to the Maryland state election laws were redacted in two places: first, in ¶ 6, the indictment recited the provisions of Md. Code Ann. Art. 33, §§ 26-29,[9] and second, in ¶ 18(2), the indictment recited that an outcome of the previously described scheme was to allow

_____

[9] Paragraph 6 of the indictment reads:

> At all relevant times material to the Indictment, the Annotated Code of Maryland, Article 33, section 26-29 prohibited any individual or corporate entity from contributing in excess of $1,000 to any one candidate or in excess of a total of $2,500 to any group of candidates in any primary or general election for public office in the state of Maryland and prohibited any individual or corporate entity from contributing in excess of $2,500 to any Maryland state political action committee in any primary or general election.

Bereano to "(2) make political contributions in excess of the limitations imposed by Maryland election law."[10] Neither reference to the Maryland state election laws is contained within the section labeled "The Scheme and Artifice to Defraud." When redactions are made to portions of the indictment not contained within the description of the scheme, no constructive amendment has occurred. See United States v. Schnabel, 939 F.2d 197, 203 (4th Cir. 1991) ("`[T]he contested language is in a predicate paragraph and therefore is not an element of the offense charged. `In determining whether there has been a variance between pleading and proof, it is the charging paragraphs that are to be examined.'" (quoting United States v. Jordan, 626 F.2d 928, 931 (D.C. Cir. 1980)). Further, the jury was instructed that violations of the state election laws could only be considered on motive and intent, the converse of Bereano's alleged good faith defense. See Bryan, 58 F.3d at 941-42 (holding mail fraud conviction does not require the government to establish proof of any violation of an underlying state law). Therefore, the redaction of the indictment was not prejudicial to Bereano.

V.

"A trial court has wide latitude in conducting voir dire. The court abuses its discretion only `where the court's restriction hinders a defendant's opportunity to make reasonable use of his challenges.'" United States v. Muldoon, 931 F.2d 282, 286 (4th Cir. 1991) (quoting King v. Jones, 824 F.2d 324, 326 (4th Cir. 1987)); see also Ham v. South Carolina, 409 U.S. 524, 527-28 (1973); United States v. Bakker, 925 F.2d 728, 733 (4th Cir. 1991) ("A trial court has broad

_____

[10] Paragraph 18 reads in full:

> By means of the foregoing scheme and artifice, BRUCE C. BEREANO was able to: (1) conceal the true identities of the actual contributors of campaign contributors of campaign funds; (2) make political contributions in excess of the limitations imposed by Maryland state election law; (3) cause candidates to file false campaign finance reports, thereby concealing the true identity of the contributor to the candidate's campaign; (4) cause his own lobbying activity reports to be false; and (5) defraud his lobbying clients of approximately $16,000 to reimburse BRUCE C. BEREANO for said political contributions.

22

discretion to control the scope of questions during <u>voir dire</u>." (citations omitted)). Therefore, the standard of review for the trial court's questions in voir dire is one of harmless error, <u>see Muldoon</u>, 931 F.2d at 286, and the standard for the conduct of voir dire generally is an abuse of discretion. <u>See Bakker</u>, 925 F.2d at 733.

"It is well settled that a trial judge may conduct <u>voir dire</u> without allowing counsel to pose questions directly to the potential jurors" as well as "question prospective jurors collectively rather than individually." <u>Bakker</u>, 925 F.2d at 734 (citing Fed. R. Crim. P. 24(a)); <u>see also</u> <u>Mu'Min v. Virginia</u>, 500 U.S. 415, 431 (1991); <u>Wells v. Murray</u>, 831 F.2d 468, 472-74 (4th Cir. 1987) (individual voir dire not required in spite of public castigation of jurors for lenience in prior case). Individual questioning is especially unnecessary when the trial court "provides for individual questioning of a juror whose initial responses prove less than satisfactory and offers potential jurors the opportunity to speak with the court privately." <u>Bakker</u>, 925 F.2d at 734. Lastly, "`it is not required . . . that jurors be totally ignorant of the facts and issues involved [in the case] . . . . It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'" <u>Id.</u> at 734 (citing <u>Irvin v. Dowd</u>, 366 U.S. 717, 722-23 (1961)).

Bereano requested extended and individual voir dire predicated on numerous newspaper articles that depicted Bereano as "the merchant of death" and "evil incarnate." The trial court denied this request. Instead, the trial judge began by asking questions to elicit whether the jurors knew of the case through media coverage. As to those members of the venire who responded to the collective voir dire, the judge questioned veniremen individually during bench conferences and allowed the attorneys to do the same. Also at those bench conferences, the judge elicited biases the jurors might have against lobbyists, and some individuals were excused on such grounds. The trial judge then asked questions to the entire venire panel to elicit any prejudices against lobbyists that may exist. The judge questioned the jurors about several aspects of political life including lobbyists, political campaigns, and PACs.[11] No juror responded to the judge's inqui-

_____

[11] The trial judge presented the following two questions:

23

ries. The voir dire of the jurors lasted two days. While the length of questioning is not relevant to the determination of whether voir dire was proper, see Bakker, 925 F.2d at 733, it is an indication of the thoroughness of the trial judge in inviting the jurors to communicate any potential problems they might have had.

The process used by the trial judge was identical to the process used in United States v. ReBrook, 58 F.3d 961, 969 (4th Cir.), cert. denied, ___ U.S. ___, 116 S.Ct. 431 (1995), and United States v. Bakker, 925 F.2d 728, 733 (4th Cir. 1991). In ReBrook, the defendant was concerned with prejudicial pretrial publicity. Id. The trial court questioned the potential jurors generally about pretrial publicity, their knowledge of the defendants and related matters. Id. The court individually questioned potential jurors whose responses suggested prejudice. Id. This Circuit found that the process was effective in insuring a fair and impartial jury. Id. In Bakker, this Circuit held the denial of individual voir dire was proper when the court "provided for individual questioning of a juror whose initial responses prove less than satisfactory and offers potential jurors the opportunity to speak with the

_____

> "The first question is whether you hold any particular opinion or opinions about lobbyists or the practice of lobbying elected officials that might affect your ability to render a fair and impartial verdict in this case? And along with that, although it is not necessarily tied to it, is the question as to whether you hold any opinion or opinions about Political Action Committees, or the making of political contributions again that might affect your ability to be fair and impartial with respect to a verdict in this case. If anybody has any such opinions, come on up here and express them at the bench."

There was no response to this question. The court then further inquired, asking "Is there anybody here who has any business or any social relationships with any lobbyists?" When a juror responded, the judge asked what the association was and whether the association would make the juror partial, to which the juror answered "Not at all, Your Honor." The judge then followed those questions with questions concerning whether any juror ran for political office or was an officer or actively involved in a campaign or political organization. There were no responses to these questions.

24

court privately." 925 F.2d at 734. Based upon this precedent and the circumstances of this case, no abuse of discretion occurred with respect to voir dire.

VI.

Bereano assigns error because the transcript of the grand jury testimony used to impeach O'Hearn was not admitted into evidence and the prosecution relied on the grand jury testimony in its closing arguments. Bereano first raised his objection in his motion in limine directly preceding the Government's closing argument. When a defendant objects to the manner in which evidence is presented, the issue is reviewed under the "harmless error" standard. See Fed. R. Crim. P. 52(a). Under Rule 52(a), "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." Because Bereano objected to the use of the grand jury testimony prior to its use in closing arguments, error which may have occurred through the use of the grand jury testimony in closing arguments, if any, is reviewed for harmless error.

Federal Rule of Evidence 613 provides that:

> (a) Examining witness concerning prior statement. In examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request the same shall be shown or disclosed to opposing counsel.

> (b) Extrinsic evidence of prior inconsistent statement of witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require.

In arguing this assignment of error, Bereano analogizes to cases involving oral statements that hold that "it is reversible error [for the Government] to fail to produce the person to whom the statement was

25

purportedly made to contradict the witness." <u>United States v. Bohle</u>, 445 F.2d 54, 73 (7th Cir. 1971); <u>see also United States v. Harris</u>, 542 F.2d 1283, 1307 (7th Cir. 1976). However, there is a clear difference between using prior inconsistent oral statements and transcribed prior inconsistent statements under oath. Therefore, there is a distinction between cases governing oral statements and the present situation.

The transcribed grand jury testimony could have been admitted into evidence if defense counsel had objected at the time O'Hearn testified. However, this omission was not error. First, Bereano had an opportunity to clarify the grand jury testimony. Further, the Government had a copy of the statement available if the defense had requested a copy. <u>See United States v. McCall</u> , 85 F.3d 1193, 1197 (6th Cir. 1996) (noting it is proper for the Government to present the prior inconsistent statements during cross-examination); <u>United States v. Hudson</u>, 970 F.2d 948, 955 (1st Cir. 1992) (holding Rule 613 does not "require that the witness be confronted with the statement while on the witness stand, but rather, only that the witness be available to be recalled in order to explain the statement during the course of the trial.") (citations omitted). However, no request for a copy was made. Likewise, instead of objecting to the failure of the Government to admit the grand jury transcript while O'Hearn was testifying, the defense remained silent concerning the incident until after both parties had rested. The issue was raised for the first time directly before the Government's closing argument. Bereano gave the court no opportunity to correct any allegedly improper omission of evidence.

Second, the Government correctly followed the procedure laid out in Federal Rule of Evidence 613 that deals with prior statements. It properly laid a foundation for the statement. On cross-examination, O'Hearn was asked and denied that there was any practice or policy at the firm to bill the clients fraudulently. On redirect, O'Hearn claimed she could not recall whether Bereano instructed her to bill political contributions as reimbursement expenses. The Government then read questions and answers from her grand jury testimony in which she testified that Bereano gave her instructions regarding how to bill clients for these political contributions. When asked if she remembered giving these answers to the grand jury, O'Hearn testified that she could not remember. O'Hearn's lack of memory concerning her prior inconsistent statements can be construed as either a denial

26

or an admission of her prior statements. Therefore, use of the grand jury testimony was proper impeachment evidence[12] and the Government relied upon it in its closing argument as such. The Government recounted O'Hearn's earlier testimony that Bereano never directed her to bill expenses as legislative entertainment. The Government then read her earlier grand jury testimony which directly contradicted her trial testimony and emphasized that "somehow, somehow Sandra Steed O'Hearn could not remember that" and that "she had forgetfulitis." The Government concluded by arguing that O'Hearn was either lying before the grand jury or at trial and that the jury could infer that "[s]he was lying to protect Bruce Bereano." Accordingly, the Government's reference to O'Hearn's grand jury testimony was proper impeachment evidence and no error occurred.

VII.

The Government objects to the trial court's determination that there

_____

[12] This Circuit also permits grand jury testimony to be used as substantive evidence under Federal Rules of Evidence 801(d)(1)(A) or 803(24). Grand jury testimony can be used as substantive evidence under Federal Rules of Evidence 801(d)(1)(A) if declarant is subject to cross-examination at trial. See United States v. Stockton, 788 F.2d 210, 219 n.14 (4th Cir. 1986) ("Simmons' prior testimony before the grand jury would be hearsay, were it not for Fed. R. Evid. 801(d)(1)(A), which exempts from the definition of hearsay prior inconsistent statements made by a witness at trial, if those statements were made `under oath subject to the penalty of perjury at a trial, hearing, or other proceeding.' Testimony before grand jury falls within the scope of the rule."); United States v. Grandison, 780 F.2d 425, 431 (4th Cir. 1985) (holding grand jury testimony admissible to protect against "turncoat" witness), cert. denied, 459 U.S. 934 (1990); United States v. DiCaro, 772 F.2d 1314, 1321 (7th Cir. 1985), cert. denied, 475 U.S. 1081 (1986); United States v. Murphy, 696 F.2d 282, 284 (4th Cir. 1982) (holding grand jury testimony is admissible under Rule 801(d)(1) if declarant testifies at trial and is cross-examined and if the grand jury testimony was given under oath), cert. denied, 461 U.S. 945 (1983). However, this Court holds that the grand jury testimony was properly relied upon only as impeachment evidence, and there is sufficient evidence to support Bereano's conviction without considering O'Hearn's grand jury testimony as substantive evidence.

was only $600 of "loss" to these victims as that term is defined under the Sentencing Guidelines. We review de novo the district court's legal interpretation of the term "loss" under the Sentencing Guidelines as well as the factors the court considers. See United States v. Castner, 50 F.3d 1267, 1274 (4th Cir. 1995); United States v. Reddeck, 22 F.3d 1504, 1511 (4th Cir. 1994); United States v. Chatterji, 46 F.3d 1336, 1340 (4th Cir. 1995). However, "`to the extent that the determination of the amount of loss is a factual matter, we review only for clear error.'" Castner, 50 F.3d at 1274 (quoting United States v. West, 2 F.3d 66, 71 (4th Cir. 1993)).

Loss is defined as the "value of the money, property, or services unlawfully taken." U.S. Sentencing Guidelines Manual § 2F1.1, comment. (n.7) (1995). The Guidelines further provide that "the loss need not be determined with precision. The court need only make a reasonable estimate of the loss . . . ." USSG § 2F1.1, comment. (n.8). However, "[t]he cumulative loss produced by a common scheme or course of conduct should be used in determining the offense level, regardless of the number of counts of conviction." USSG § 2F1.1, comment. (n.6).

The trial court noted several reasons to support its holding that no enhancement for loss sustained was warranted. These reasons, noted as follows, were improperly considered in determining whether a loss enhancement is warranted: (1) the clients may have benefitted from the fraud,[13] (2) the assertion that Bereano received little benefit,[14] and

_____

[13] See Castner, 50 F.3d at 1276 (notwithstanding the alleged benefit to clients, "the payment fraudulently obtained in excess of the amount to which a defendant is legally entitled . . . is [the] measure of the amount of loss for sentencing purposes" and the argument that loss occurred because parts were received faster and cheaper was irrelevant); United States v. Rothberg, 954 F.2d 217, 219 (4th Cir. 1992) (reversing the trial court's decision that because the bank could benefit in the future by collecting on the existing collateral underlying a false loan application, the amount of loss was too speculative).

[14] See United States v. Campbell , 42 F.3d 1199, 1205 (9th Cir. 1994) ("We do not subtract the costs of pulling off the caper when we calculate the value of the stolen property."), cert. denied, 514 U.S. 1091 (1995); United States v. Schweitzer, 5 F.3d 44, 47 (3rd Cir. 1993) (refusing to deduct the amount of the bribe paid in calculating benefit under the guidelines).

(3) the clients' desire that Bereano should be dealt with leniently.**15**

In addition, the trial court found that the Government failed to establish that $16,000 of loss was sustained as opposed to $600. When requesting a sentence enhancement, the Government bears the burden of proving, by a preponderance of the evidence, the victim's losses. See Reddeck, 22 F.3d at 1512. In support of that determination, we agree that the Government's factual evidence failed in several ways. First, many of the check stubs and other documents showing that clients had been falsely billed were not presented to the sentencing court. Even if they had been, the total amount of all the check stubs submitted at trial was $1300 and only two of these stubs, totaling $600, clearly showed that the reimbursements paid would be billed to the clients as "legislative entertainment." Second, many of the documents showing which clients were billed for which portions of the political contributions were destroyed.**16** The bills do not note justifications for the various "legislative entertainment" expenses, but there was no connection proven between specific contributions and specific "legislative entertainment" charges beyond the two specific check stubs totaling $600. Finally, there was evidence of computer printouts noting that political contributions were "billed off," implying clients were billed improperly for these expenses, but there was

_____

**15** See Reddeck, 22 F.3d at 1512 (holding the sentencing guidelines do not provide for "an abstract factoring of a victim's residual and subjective `satisfaction.' Calculation of lost value requires an objective standard, usually measured by the `fair market value.'" (citing USSG § 2B1.1, comment. (n. 2)).

**16** After inquiries were made by a legislator concerning one of Bereano's contributions, many of O'Hearn's notes designating which clients were billed for which contributions were destroyed for fear of discovery. The few notes that survived became the basis for these mail fraud allegations. The Government asserts that other allegations of overbilling, i.e. that a total of $16,000 worth of overbilling occurred, were not criminally pursued because, though the Government had evidence in the form of check stubs and client bills that overbilling had occurred, the destruction of the notes in regard to those transactions made the specifics of who was overbilled on which occasions most difficult to prove beyond a reasonable doubt. As noted above, only two check stubs clearly showed that clients were billed for political reimbursements and those two stubs totaled only $600.

29

testimony alleging that not all items marked billed off in the computer meant that clients were billed for those expenses. Based upon the insufficiency of the Government's evidence, the trial court's refusal to enhance Bereano's sentence based on losses over $10,000 is affirmed.

VIII.

The Government also noted its objection to the trial court's reasoning for downwardly departing. Previously, this Court applied a multi-part analysis which involved:

> (1) a <u>de novo</u> standard [of review] to determine whether the reasons the district court used to support its departure encompassed a factor not adequately taken into consideration by the Sentencing Commission in formulating the guidelines, (2) a clearly erroneous standard to review whether the district court had adequate factual support to depart on the basis of the factor, (3) an abuse of discretion standard to determine whether the factor is of sufficient importance to justify a sentence outside the guideline range, and (4) an abuse of discretion standard to review whether the extent of the departure was reasonable.

<u>United States v. Hairston</u>, 96 F.3d 102, 106 (4th Cir. 1996) (citations and internal quotations omitted). However, <u>Koon v. United States</u>, ___ U.S. ___, 116 S.Ct. 2035, 2048 (1996), abolished the "de novo" review under the above multi-layered test and substituted a "unitary abuse of discretion standard." This "unitary abuse of discretion standard" includes:

> a legal analysis as to whether the Commission listed certain factors as forbidden, discouraged or encouraged departure bases. We do not accord a district court's legal conclusions on these questions any particular deference. However, we do defer to a sentencing court's fact-based determination as to whether the presence of a suggested feature removed a case from the "heartland" for which the guideline was designed. Because "[a] district court by definition abuses its discretion

30

> when it makes an error of law," our overall review is thus for abuse of discretion.

Hairston, 96 F.3d at 106-07 (citing Koon , ___ U.S. at ___, 116 S.Ct. at 2048); see also United States v. Rybicki, 96 F.3d 754, 757 (4th Cir. 1996); United States v. Brock, 108 F.3d 31, 33 (4th Cir. 1997) ("The [Koon] Court explained that when assessing whether a potential basis for departure was adequately considered by the Commission in formulating the guidelines, the correct inquiry necessarily focuses on whether the factor is addressed by the guidelines, policy statements, or official commentary and whether it is encompassed within the heartland of situations to which the guidelines were intended to apply." (citing Koon, ___ U.S. ___, 116 S.Ct. at 2044-45)).

The reasons given by the trial court justifying the downward departure in essence are two-fold: (1) Bereano did not profit from his crime; and (2) the victims do not feel defrauded. Using the above standard of review, we must review the use of these factors for any legal errors constituting an abuse of discretion.

Defendant's first argument is akin to this court's reasoning in United States v. Seacott, 15 F.3d 1380 (4th Cir. 1994). In that case, the district court reasoned that the Guidelines did not take into account the possibility that a defendant would be motivated by reasons other than his own personal gain in the context of misapplying funds in violation of 18 U.S.C. § 657 (1994). See id. at 1387. We held that such reasoning was a "legally insufficient reason to depart from the applicable Guidelines range." Id. There, as here, a departure based on the belief that a crime was committed "without concern for [a defendant's] own economic self-interest" is clear error. Id. The Guidelines consider both harm to the victim and gain to the defendant, and therefore, a lack of profit motive reason used to depart is in direct contravention to the Guidelines. See id. "The same amount has been taken from the victim no matter what the fate of the funds. The aim of the criminal law in this area is to deter misapplication of funds for any reason." Id. Therefore, reliance on this factor is legal error.**17**

_____

**17** It is difficult to accept the proposition that Bereano did not benefit, as the amount of political contributions was a part of the "overhead" of his lobbying practice. The result would be the same if he billed clients for office rent or car payments under the heading of "legislative entertainment."

31

As to the perceptions of the victims, the Guidelines contain several provisions for adjustments to a sentence based on the effect of the crime on a victim. See, e.g., USSG §§ 5K2.1, 5K2.2, 5K2.3, 5K2.4, 5K2.8, and 5K2.10. None of these provisions, however, justify a departure when the victim allegedly does not perceive being wronged. The Sentencing Commission considered enhancement for aggravating circumstances, and downward departures for lesser harms. Further, the trial court considered the victims' perceptions when deciding not to enhance the loss calculation. Since we have found that this factor should not be considered in enhancing the loss calculation, double counting is no longer an issue. However, we find that the use of that factor as a basis for granting a downward departure is also impermissible. See United States v. Ellen, 961 F.2d 462, 468 (4th Cir.), cert. denied, 506 U.S. 875 (1992). The trial court relied upon this factor when it stated

> I am limiting the [downward] departure to only two-levels, because I find some merit to the concerns that have been expressed by the Government. One [concern] as Mr. Kelberman has put it [is] we are riding the same horse to some extent by reason of the fact that no loss enhancement was applied [due to the victims' statement that they did not feel defrauded.]

In light of the Koon decision, which this Court notes post-dated the trial court's ruling, the trial court relied upon impermissible reasons for granting a downward departure. Accordingly, sentencing is vacated and remanded for the district court's reconsideration.

IX.

In conclusion, we affirm the jury's verdict and the district court's upholding of this verdict which finds Bereano guilty of mail fraud. The evidence is sufficient to uphold conviction under either 18 U.S.C. § 1341 or § 1346; the Maryland election laws were irrelevant and if their presentation to the jury was error, it was harmless error; there was no abuse of discretion in the voir dire procedure employed; and the use of grand jury testimony was proper impeachment evidence and was not error. Further, the district court did not err in calculating the loss sustained in regard to the sentence enhancement sought by

32

the Government. Based upon recent precedent, however, we hold that the district court abused its discretion in granting a downward departure. Accordingly, Bereano's sentence is vacated, and his sentencing is remanded to the district court for reconsideration in light of <u>Koon</u>, <u>Rybicki</u>, and this Court's findings.

<u>AFFIRMED IN PART AND VACATED</u>
<u>AND REMANDED AS TO SENTENCING</u>

WILSON, Chief District Judge, concurring in part and dissenting in part:

I concur with the majority's opinion except for part VI, in which the majority concludes that the district court properly permitted the government to read extremely damaging, and I believe clearly unadmitted, grand jury testimony during closing argument. I, therefore, respectfully dissent from this part of the opinion.

The rule that guides my dissent is quite basic: counsel may not read to the jury in closing argument material not in evidence. <u>See Graham v. United States</u>, 257 F.2d 724, 730 (6th Cir. 1958); <u>see also United States v. Morsley</u>, 64 F.3d 907, 913 (4th Cir. 1995) ("The prosecutor's statement that McKoy had pled guilty to Count 91 when no such fact was in evidence was unquestionably improper."). At trial, the government questioned Bereano's bookkeeper, Sandra O'Hearn, about Bereano's involvement in billing and about her purported grand jury testimony. O'Hearn exculpated Bereano and answered that she could not recall what she had been asked and what she had answered before the grand jury. The government never followed up by seeking to introduce that testimony. In closing argument, however, the government read the unadmitted, purported grand jury testimony at length and commented:

> Now, if you don't believe her, <u>and you have good reason not to believe her because her testimony was diametrically opposed to what she said in the Grand Jury,</u> you then have to ask yourself the next question. Well, if she's lying, who is she lying for and why is she lying? That one you can figure out. She wasn't lying to help the government. She was

33

> lying to protect Bruce Bereano. An innocent man, ladies and
> gentlemen, does not need a bookkeeper to lie for him.

(emphasis added). I would find no fault had the prosecutor argued that O'Hearn's memory lapse was less than candid. However, he read O'Hearn's purported grand jury testimony as established fact and argued that it flatly contradicted her trial testimony. O'Hearn appears to have been a key player in these events, and the assertion that her trial testimony was diametrically opposed to her grand jury testimony was a powerful argument. The argument is more than problematic, however, because the court never admitted her grand jury testimony at trial, and the testimony is not even a part of the record in this court. Thus, all we have is the prosecutor's questions and O'Hearn's response that she could remember neither the questions nor her answers before the grand jury. This exchange produced not even a scintilla of evidence to support the argument that O'Hearn's grand jury testimony conflicted with her trial testimony.[1] Because I cannot conclude on this record that the error did not affect the outcome of the trial, I respectfully dissent.[2]

_____

[1] I also dissent from the second sentence of the third paragraph on page 5 of part I, in which the majority states: "O'Hearn testified before the grand jury that Bereano instructed her to bill his lobbying clients for a pro-rated portion of various political contributions under the category of legislative expenses." I dissent from this characterization because, as stated above, the grand jury testimony was not admitted and is not a part of the record before us.

[2] The majority states that O'Hearn's failure to recollect her grand jury testimony could be construed "as either a denial or an admission of her prior statements," and that the government therefore could use the grand jury testimony for impeachment purposes. I do not agree that the jury, simply from O'Hearn's failure to recollect a series of statements made 18 months earlier, could infer that she made the statements as recited by the government. See Bingham v. Zolt, 66 F.3d 553, 566 (2d Cir. 1995) (noting, in rejecting party's argument that the jury improperly was allowed to infer that he was lying, that "[i]n a sidebar, the trial judge did note that the jury could infer Zolt was lying. However . . . the judge meant that the jury could credit documentary evidence where Zolt claimed not to remember . . . [and] at no time did the judge instruct the

34

jury that a witness's inability to recall constituted evidence of the facts asserted in an attorney's question.").

Additionally, the government used the purported grand jury testimony, not only for impeachment, but for its substantive content. The government referenced O'Hearn's testimony in the context of attempting to prove Bereano's knowledge and participation in the billing scheme, and stated that "like it or not, Miss O'Hearn's testimony helps our case immeasurably." The word "testimony" in this sentence could refer only to O'Hearn's grand jury testimony, because O'Hearn testified at trial that Bereano had not directed a scheme to bill the clients for the political contributions. This use of the grand jury testimony, even under the majority's analysis, was improper.

Finally, the fact that the grand jury testimony could have been admitted at trial, as the majority points out, is irrelevant. Having failed to enter the testimony into evidence, the government could not base its closing argument upon it. See Johnson v. United States, 347 F.2d 803, 805 (D.C. Cir. 1965) ("It is elementary . . . that counsel may not premise arguments on evidence which has not been admitted.").

35